## ALMEIDA-SANCHEZ *v.* UNITED STATES

No. 71–6278. Argued March 19 and 28, 1973—
Decided June 21, 1973

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 275. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 285.

*James A. Chanoux,* and *John J. Cleary* by appointment of the Court, 411 U. S. 903, argued the cause for petitioner. *Mr. Chanoux* was on the brief.

*Deputy Solicitor General Lacovara* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Petersen, Mark L. Evans, Beatrice Rosenberg,* and *Roger A. Pauley.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner in this case, a Mexican citizen holding a valid United States work permit, was convicted of having knowingly received, concealed, and facilitated the transportation of a large quantity of illegally imported marihuana in violation of 21 U. S. C. § 176a (1964 ed.). His sole contention on appeal was that the search of his automobile that uncovered the marihuana was unconstitutional under the Fourth Amendment and that, under the rule of *Weeks* v. *United States,* 232 U. S. 383, the marihuana should not have been admitted as evidence against him.

The basic facts in the case are neither complicated nor disputed. The petitioner was stopped by the United States Border Patrol on State Highway 78 in California, and his car was thoroughly searched. The road is essentially an east-west highway that runs for part of its course through an undeveloped region. At about the point where the petitioner was stopped the road meanders north as well as east—but nowhere does the road reach the Mexican border, and at all points it lies north of U. S. 80, a major east-west highway entirely within the

---

*Luke McKissack* filed a brief as *amicus curiae* urging reversal. *Arthur Wells, Jr.,* filed a brief for Gilbert Foerster as *amicus curiae.*

United States that connects the Southwest with the west coast. The petitioner was some 25 air miles north of the border when he was stopped. It is undenied that the Border Patrol had no search warrant, and that there was no probable cause of any kind for the stop or the subsequent search—not even the "reasonable suspicion" found sufficient for a street detention and weapons search in *Terry* v. *Ohio,* 392 U. S. 1, and *Adams* v. *Williams,* 407 U. S. 143.

The Border Patrol conducts three types of surveillance along inland roadways, all in the asserted interest of detecting the illegal importation of aliens. Permanent checkpoints are maintained at certain nodal intersections; temporary checkpoints are established from time to time at various places; and finally, there are roving patrols such as the one that stopped and searched the petitioner's car. In all of these operations, it is argued, the agents are acting within the Constitution when they stop and search automobiles without a warrant, without probable cause to believe the cars contain aliens, and even without probable cause to believe the cars have made a border crossing. The only asserted justification for this extravagant license to search is § 287 (a) (3) of the Immigration and Nationality Act, 66 Stat. 233, 8 U. S. C. § 1357 (a) (3), which simply provides for warrantless searches of automobiles and other conveyances "within a reasonable distance from any external boundary of the United States," as authorized by regulations to be promulgated by the Attorney General. The Attorney General's regulation, 8 CFR § 287.1, defines "reasonable distance" as "within 100 air miles from any external boundary of the United States."

The Court of Appeals for the Ninth Circuit recognized that the search of petitioner's automobile was not a "border search," but upheld its validity on the basis of

the above-mentioned portion of the Immigration and Nationality Act and the accompanying regulation. 452 F. 2d 459, 461. We granted certiorari, 406 U. S. 944, to consider the constitutionality of the search.

I

No claim is made, nor could one be, that the search of the petitioner's car was constitutional under any previous decision of this Court involving the search of an automobile. It is settled, of course, that a stop and search of a moving automobile can be made without a warrant. That narrow exception to the warrant requirement was first established in *Carroll* v. *United States,* 267 U. S. 132. The Court in *Carroll* approved a portion of the Volstead Act providing for warrantless searches of automobiles when there was probable cause to believe they contained illegal alcoholic beverages. The Court recognized that a moving automobile on the open road presents a situation "where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.,* at 153. *Carroll* has been followed in a line of subsequent cases,[1] but the *Carroll* doctrine does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search.[2] As MR. JUSTICE WHITE wrote for the Court in *Chambers* v. *Maroney,* 399

---

[1] *E. g., Chambers* v. *Maroney,* 399 U. S. 42; *Dyke* v. *Taylor Implement Mfg. Co.,* 391 U. S. 216; *Brinegar* v. *United States,* 338 U. S. 160; *Husty* v. *United States,* 282 U. S. 694.

[2] Moreover, "[n]either *Carroll, supra,* nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords." *Chambers* v. *Maroney, supra,* at 50. See also *Coolidge* v. *New Hampshire,* 403 U. S. 443, 458–464.

U. S. 42, 51: "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution."

In seeking a rationale for the validity of the search in this case, the Government thus understandably sidesteps the automobile search cases. Instead, the Government relies heavily on cases dealing with administrative inspections. But these cases fail to support the constitutionality of this search.

In *Camara* v. *Municipal Court*, 387 U. S. 523, the Court held that administrative inspections to enforce community health and welfare regulations could be made on less than probable cause to believe that particular dwellings were the sites of particular violations. *Id.*, at 534–536, 538. Yet the Court insisted that the inspector obtain either consent or a warrant supported by particular physical and demographic characteristics of the areas to be searched. *Ibid.* See also *See* v. *City of Seattle*, 387 U. S. 541. The search in the present case was conducted in the unfettered discretion of the members of the Border Patrol, who did not have a warrant,[3] probable cause, or consent. The search thus embodied precisely the evil the Court saw in *Camara* when it insisted that the "discretion of the official in the field" be circumscribed by obtaining a warrant prior to the inspection. *Camara, supra,* at 532–533.

Two other administrative inspection cases relied upon by the Government are equally inapposite. *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72, and *United States* v. *Biswell*, 406 U. S. 311, both approved

---

[3] The Justices who join this opinion are divided upon the question of the constitutionality of area search warrants such as described in MR. JUSTICE POWELL's concurring opinion.

warrantless inspections of commercial enterprises engaged in businesses closely regulated and licensed by the Government. In *Colonnade,* the Court stressed the long history of federal regulation and taxation of the manufacture and sale of liquor, 397 U. S., at 76–77. In *Biswell,* the Court noted the pervasive system of regulation and reporting imposed on licensed gun dealers, 406 U. S., at 312 n. 1, 315–316.

A central difference between those cases and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him. As the Court stated in *Biswell:*

> "It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. Each licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority. . . . The dealer is not left to wonder about the purposes of the inspector or the limits of his task." *Id.,* at 316.

Moreover, in *Colonnade* and *Biswell,* the searching officers knew with certainty that the premises searched were in fact utilized for the sale of liquor or guns. In the present case, by contrast, there was no such assurance that the individual searched was within the proper scope of official scrutiny—that is, there was no reason

whatever to believe that he or his automobile had even crossed the border, much less that he was guilty of the commission of an offense.

## II

Since neither this Court's automobile search decisions nor its administrative inspection decisions provide any support for the constitutionality of the stop and search in the present case, we are left simply with the statute that purports to authorize automobiles to be stopped and searched, without a warrant and "within a reasonable distance from any external boundary of the United States." It is clear, of course, that no Act of Congress can authorize a violation of the Constitution. But under familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment. *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348 (Brandeis, J., concurring).

It is undoubtedly within the power of the Federal Government to exclude aliens from the country. *Chae Chan Ping* v. *United States,* 130 U. S. 581, 603–604. It is also without doubt that this power can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders. As the Court stated in *Carroll* v. *United States:* "Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." 267 U. S., at 154. See also *Boyd* v. *United States,* 116 U. S. 616.

Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For

example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.[4]

But the search of the petitioner's automobile by a roving patrol, on a California road that lies at all points at least 20 miles north of the Mexican border,[5] was of a wholly different sort. In the absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free of "unreasonable searches and seizures."

It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It

---

[4] With respect to aircraft, 8 CFR § 281.1 defines "reasonable distance" as "any distance fixed pursuant to paragraph (b) of this section." Paragraph (b) authorizes the Commissioner of Immigration and Naturalization to approve searches at a greater distance than 100 air miles from a border "because of unusual circumstances."

[5] The Government represents that the highway on which this search occurred is a common route for illegally entered aliens to travel, and that roving patrols apprehended 195 aliens on that road in one year. But it is, of course, quite possible that every one of those aliens was apprehended as a result of a valid search made upon probable cause. On the other hand, there is no telling how many perfectly innocent drivers have been stopped on this road without any probable cause, and been subjected to a search in the trunks, under the hoods, and behind the rear seats of their automobiles.

is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

"These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar* v. *United States,* 338 U. S. 160, 180 (Jackson, J., dissenting).

The Court that decided *Carroll* v. *United States, supra,* sat during a period in our history when the Nation was confronted with a law enforcement problem of no small magnitude—the enforcement of the Prohibition laws. But that Court resisted the pressure of official expedience against the guarantee of the Fourth Amendment. Mr. Chief Justice Taft's opinion for the Court distinguished between searches at the border and in the interior, and clearly controls the case at bar:

"It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is

known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." 267 U. S., at 153–154.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, concurring.

While I join the opinion of the Court, which sufficiently establishes that none of our Fourth Amendment decisions supports the search conducted in this case, I add this concurring opinion to elaborate on my views as to the meaning of the Fourth Amendment in this context. We are confronted here with the all-too-familiar necessity of reconciling a legitimate need of government with constitutionally protected rights. There can be no question as to the seriousness and legitimacy of the law enforcement problem with respect to enforcing along thousands of miles of open border valid immigration and related laws. Nor can there be any question as to the necessity, in our free society, of safeguarding persons against searches and seizures proscribed by the Fourth Amendment. I believe that a resolution of the issue raised by this case is possible with due recognition of both of these interests, and in a manner compatible with the prior decisions of this Court.[1]

## I

The search here involved was carried out as part of a roving search of automobiles in an area generally proximate to the Mexican border. It was not a border search,

---

[1] I am in accord with the Court's conclusion that nothing in § 287 (a)(3) of the Immigration and Nationality Act, 8 U. S. C. § 1357 (a)(3), or in 8 CFR § 287.1 serves to authorize an otherwise unconstitutional search.

nor can it fairly be said to have been a search conducted at the "functional equivalent" of the border. Nor does this case involve the constitutional propriety of searches at permanent or temporary checkpoints removed from the border or its functional equivalent. Nor, finally, was the search based on cause in the ordinary sense of specific knowledge concerning an automobile or its passengers.[2] The question posed, rather, is whether and under what circumstances the Border Patrol may lawfully conduct roving searches of automobiles in areas not far removed from the border for the purpose of apprehending aliens illegally entering or in the country.

The Government has made a convincing showing that large numbers of aliens cross our borders illegally at places other than established crossing points, that they are often assisted by smugglers, that even those who cross on foot are met and transported to their destinations by automobiles, and that roving checks of automobiles are the only feasible means of apprehending them. It would, of course, be wholly impracticable to maintain a constant patrol along thousands of miles of border. Moreover, because many of these aliens cross the border on foot, or at places other than established checkpoints, it is simply not possible in most cases for the Government to obtain specific knowledge that a person riding or stowed in an automobile is an alien illegally in the coun-

---

[2] The Solicitor General's brief in this Court states explicitly that "We . . . do not take the position that the checking operations are justified because the officers have probable cause or even 'reasonable suspicion' to believe, with respect to each vehicle checked, that it contains an illegal alien. Apart from the reasonableness of establishment of the checking operation in this case, there is nothing in the record to indicate that the Border Patrol officers had any special or particular reason to stop petitioner and examine his car." Brief for the United States 9–10.

try. Thus the magnitude of the problem is clear. An answer, reconciling the obvious needs of law enforcement with relevant constitutional rights, is far less clear.

## II

The Government's argument to sustain the search here is simply that it was reasonable under the circumstances. But it is by now axiomatic that the Fourth Amendment's proscription of "unreasonable searches and seizures" is to be read in conjunction with its command that "no Warrants shall issue, but upon probable cause." Under our cases, both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, though in certain limited circumstances neither is required.

Before deciding whether a warrant is required, I will first address the threshold question of whether some functional equivalent of probable cause may exist for the type of search conducted in this case. The problem of ascertaining the meaning of the probable-cause requirement in the context of roving searches of the sort conducted here is measurably assisted by the Court's opinion in *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), on which the Government relies heavily. The Court was there concerned with the nature of the probable-cause requirement in the context of searches to identify housing code violations and was persuaded that the only workable method of enforcement was periodic inspection of all structures:

> "It is here that the probable cause debate is focused, for the agency's decision to conduct an area inspection is unavoidably based on its appraisal of conditions in the area as a whole, not on its knowledge of conditions in each particular building." *Id.,* at 536.

In concluding that such general knowledge met the probable-cause requirement under those circumstances, the Court took note of a "long history of judicial and public acceptance," of the absence of other methods for vindicating the public interest in preventing or abating dangerous conditions, and of the limited invasion of privacy occasioned by administrative inspections which are "neither personal in nature nor aimed at the discovery of evidence of crime." *Id.,* at 537.

Roving automobile searches in border regions for aliens, likewise, have been consistently approved by the judiciary. While the question is one of first impression in this Court, such searches uniformly have been sustained by the courts of appeals whose jurisdictions include those areas of the border between Mexico and the United States where the problem has been most severe. See, *e. g.,* *United States* v. *Miranda,* 426 F. 2d 283 (CA9 1970); *Roa-Rodriquez* v. *United States,* 410 F. 2d 1206 (CA10 1969). Moreover, as noted above, no alternative solution is reasonably possible.

The Government further argues that such searches resemble those conducted in *Camara* in that they are undertaken primarily for administrative rather than prosecutorial purposes, that their function is simply to locate those who are illegally here and to deport them. Brief for the United States 28 n. 25. This argument is supported by the assertion that only 3% of aliens apprehended in this country are prosecuted. While the low rate of prosecution offers no great solace to the innocent whose automobiles are searched or to the few who are prosecuted, it does serve to differentiate this class of searches from random area searches which are no more than "fishing expeditions" for evidence to support prosecutions. The possibility of prosecution does not distinguish such searches from those involved in *Camara.* Despite the Court's assertion in that case that the searches

were not "aimed at the discovery of evidence of crime," 387 U. S., at 537, violators of the housing code there were subject to criminal penalties. *Id.*, at 527 n. 2.

Of perhaps greater weight is the fact that these searches, according to the Government, are conducted in areas where the concentration of illegally present aliens is high, both in absolute terms and in proportion to the number of persons legally present. While these searches are not border searches in the conventional sense, they are incidental to the protection of the border and draw a large measure of justification from the Government's extraordinary responsibilities and powers with respect to the border. Finally, and significantly, these are searches of automobiles rather than searches of persons or buildings. The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building. This Court "has long distinguished between an automobile and a home or office." *Chambers* v. *Maroney,* 399 U. S. 42, 48 (1970). As the Government has demonstrated, and as those in the affected areas surely know, it is the automobile which in most cases makes effective the attempts to smuggle aliens into this country.

The conjunction of these factors—consistent judicial approval, absence of a reasonable alternative for the solution of a serious problem, and only a modest intrusion on those whose automobiles are searched—persuades me that under appropriate limiting circumstances there may exist a constitutionally adequate equivalent of probable cause to conduct roving vehicular searches in border areas.

### III

The conclusion that there may be probable cause to conduct roving searches does not end the inquiry, for "except in certain carefully defined classes of cases, a search of private property without proper consent is

'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court, supra,* at 528–529. I expressed the view last Term that the warrant clause reflects an important policy determination: "The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility is to enforce the laws, to investigate, and to prosecute. . . . But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks." *United States* v. *United States District Court,* 407 U. S. 297, 317 (1972). See also *Coolidge* v. *New Hampshire,* 403 U. S. 443, 481 (1971); *Chimel* v. *California,* 395 U. S. 752, 763–764 (1969).

To justify warrantless searches in circumstances like those presented in this case, the Government relies upon several of this Court's decisions recognizing exceptions to the warrant requirement. A brief review of the nature of each of these major exceptions illuminates the relevant considerations in the present case. In *Terry* v. *Ohio,* 392 U. S. 1 (1968), the Court held that a policeman may conduct a limited "pat down" search for weapons when he has reasonable grounds for believing that criminal conduct has taken or is taking place and that the person he searches is armed and dangerous. "The sole justification [for such a] search . . . is the protection of the police officer and others nearby . . . ." *Id.,* at 29. Nothing in *Terry* supports an exception to the warrant requirement here.

*Colonnade Catering Corp.* v. *United States,* 397 U. S. 72 (1970), and *United States* v. *Biswell,* 406 U. S. 311 (1972), on which the Government also relies, both concerned the standards which govern inspections of the business premises of those with federal licenses to engage in the sale of liquor, *Colonnade,* or the sale of guns,

*Biswell.* In those cases, Congress was held to have power to authorize warrantless searches. As the Court stated in *Biswell:*

> "When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." 406 U. S., at 316.

*Colonnade* and *Biswell* cannot fairly be read to cover cases of the present type. One who merely travels in regions near the borders of the country can hardly be thought to have submitted to inspections in exchange for a special perquisite.

More closely in point on their facts are the cases involving automobile searches. *E. g., Carroll* v. *United States,* 267 U. S. 132 (1925); *Chambers* v. *Maroney, supra; Coolidge* v. *New Hampshire, supra.* But while those cases allow automobiles to be searched without a warrant in certain circumstances, the principal rationale for this exception to the warrant clause is that under those circumstances "it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll* v. *United States, supra,* at 153. The Court today correctly points out that a warrantless search under the *Carroll* line of cases must be supported by probable cause in the sense of specific knowledge about a particular automobile. While, as indicated above, my view is that on appropriate facts the Government can satisfy the probable cause requirement for a roving search in a border area without possessing information about particular automobiles, it does not follow that the warrant requirement is inapposite. The very fact that the Government's supporting information relates to criminal activity in certain areas rather than

to evidence about a particular automobile renders irrelevant the justification for warrantless searches relied upon in *Carroll* and its progeny. Quite simply, the roving searches are justified by experience with obviously non-mobile sections of a particular road or area embracing several roads.

None of the foregoing exceptions to the warrant requirement, then, applies to roving automobile searches in border areas. Moreover, the propriety of the warrant procedure here is affirmatively established by *Camara.* See also *See* v. *City of Seattle,* 387 U. S. 541 (1967). For the reasons outlined above, the Court there ruled that probable cause could be shown for an area search, but nonetheless required that a warrant be obtained for unconsented searches. The Court indicated its general approach to exceptions to the warrant requirement:

> "In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara* v. *Municipal Court, supra,* at 533.

See also *United States* v. *United States District Court, supra,* at 315.

The Government argues that *Camara* and *See* are distinguishable from the present case for the purposes of the warrant requirement. It is true that while a building inspector who is refused admission to a building may easily obtain a warrant to search that building, a member of the Border Patrol has no such opportunity when

he is refused permission to inspect an automobile. It is also true that the judicial function envisioned in *Camara* did not extend to reconsideration of "the basic agency decision to canvass an area," *Camara* v. *Municipal Court, supra,* at 532, while the judicial function here would necessarily include passing on just such a basic decision.

But it does not follow from these distinctions that "no warrant system can be constructed that would be feasible and meaningful." Brief for the United States 36. Nothing in the papers before us demonstrates that it would not be feasible for the Border Patrol to obtain advance judicial approval of the decision to conduct roving searches on a particular road or roads for a reasonable period of time.[3] According to the Government, the incidence of illegal transportation of aliens on certain roads is predictable, and the roving searches are apparently planned in advance or carried out according to a predetermined schedule. The use of an area warrant procedure would surely not "frustrate the governmental purpose behind the search." *Camara* v. *Municipal Court, supra,* at 533. It would of course entail some inconvenience, but inconvenience alone has never been thought to be an adequate reason for abrogating the warrant requirement. *E. g., United States* v. *United States District Court, supra,* at 321.

Although standards for probable cause in the context of this case are relatively unstructured (cf. *id.,* at 322), there are a number of relevant factors which would merit consideration: they include (i) the frequency with which aliens illegally in the country are known or reasonably believed to be transported within a particular area;

---

[3] There is no reason why a judicial officer could not approve where appropriate a series of roving searches over the course of several days or weeks. Experience with an initial search or series of searches would be highly relevant in considering applications for renewal of a warrant.

(ii) the proximity of the area in question to the border; (iii) the extensiveness and geographic characteristics of the area, including the roads therein and the extent of their use,[4] and (iv) the probable degree of interference with the rights of innocent persons, taking into account the scope of the proposed search, its duration, and the concentration of illegal alien traffic in relation to the general traffic of the road or area.

In short, the determination of whether a warrant should be issued for an area search involves a balancing of the legitimate interests of law enforcement with protected Fourth Amendment rights. This presents the type of delicate question of constitutional judgment which ought to be resolved by the Judiciary rather than the Executive. In the words of *Camara,*

> "This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search." 387 U. S., at 532–533.

Nor does the novelty of the problem posed by roving searches in border areas undermine the importance of a prior judicial determination. When faced with a similarly unconventional problem last Term in *United States District Court, supra,* we recognized that the focus of the search there involved was "less precise than that directed against more conventional types of crime," and that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in rela-

---

[4] Depending upon the circumstances, there may be probable cause for the search to be authorized only for a designated portion of a particular road or such cause may exist for a designated area which may contain one or more roads or tracks. Particularly along much of the Mexican border, there are vast areas of uninhabited desert and arid land which are traversed by few, if any, main roads or highways, but which nevertheless may afford opportunities—by virtue of their isolated character—for the smuggling of aliens.

tion to the legitimate need of Government . . . and the protected rights of our citizens." 407 U. S., at 322–323. Yet we refused to abandon the Fourth Amendment commitment to the use of search warrants whenever this is feasible with due regard to the interests affected.

For the reasons stated above, I think a rational search warrant procedure is feasible in cases of this kind. As no warrant was obtained here, I agree that the judgment must be reversed. I express no opinion as to whether there was probable cause to issue a warrant on the facts of this particular case.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

Trial and conviction in this case were in the United States District Court for the Southern District of California under an indictment charging that petitioner, contrary to 21 U. S. C. § 176a (1964 ed.), had knowingly received, concealed, and facilitated the transportation of approximately 161 pounds of illegally imported marihuana. He was sentenced to five years' imprisonment. He appealed on the sole ground that the District Court had erroneously denied his motion to suppress marihuana allegedly seized from his automobile in violation of the Fourth Amendment.

The motion to suppress was heard on stipulated evidence in the District Court.[1] United States Border Patrol Officers Shaw and Carrasco stopped petitioner's car shortly after midnight as it was traveling from Calexico, on the California-Mexico border, toward Blythe, Cali-

[1] The facts, except for when petitioner was stopped, are taken from the oral stipulation in open court. See App. 11–14. The time petitioner was stopped is given by the Complaint as 12:15 a. m., App. 4, while petitioner testified at trial that he was "stopped about 1:00." 3 Tr. of Rec. 62.

fornia. The stop was made on Highway 78 near Glamis, California, 50 miles by road from Calexico. The highway was "about the only north-south road in California coming from the Mexican border that does not have an established checkpoint." [2] Because of that, "it is commonly used to evade check points by both marijuana and alien smugglers." On occasions "but not at all times," officers of the Border Patrol "maintain a roving check of vehicles and persons on that particular highway." Pursuant to this practice "they stopped this vehicle for the specific purpose of checking for aliens." Petitioner's identification revealed that he was a resident of Mexicali, Mexico, but that he held a work permit for the United States. Petitioner had come from Mexicali, had picked up the car in Calexico and was on his way to Blythe to deliver it. He intended to return to Mexicali by bus.[3] The officers had been advised by an official bulletin that aliens illegally entering the United States sometimes concealed themselves by sitting upright behind the back seat rest of a car, with their legs folded under the back seat from which the springs had been removed. While looking under the rear seat of petitioner's car for aliens, the officers discovered packages believed by them to contain marihuana. Petitioner was placed under arrest and advised of his rights. His car was then searched for additional marihuana, which was found in substantial amounts.

On this evidence, the motion to suppress was denied,

---

[2] West of Glamis the prevailing direction of the highway is east-west. At the point of the stop west of Glamis, the highway is only approximately 20 miles north of the border, running parallel to it. East of Glamis, the highway proceeds sharply northeast to Blythe, a distance of over 50 miles.

[3] It appears, see App. 12, 13, that the officers were informed of these facts before initiating any search for aliens, and hence before finding any contraband.

and petitioner was convicted. A divided Court of Appeals affirmed, 452 F. 2d 459 (CA9 1971), relying on its prior cases and on § 287 (a)(3) of the Immigration and Nationality Act, 8 U. S. C. § 1357 (a)(3), which provides that officers of the Immigration and Naturalization Service shall have the power, without warrant, to search any vehicle for aliens within a reasonable distance from any external boundary of the United States.[4]   I dissent from the reversal of this judgment.

## I

The Fourth Amendment protects the people "in their persons, houses, papers, and effects, against unreasonable searches and seizures" and also provides that "no Warrants shall issue, but upon probable cause . . . ." The ordinary rule is that to be reasonable under the Amendment a search must be authorized by warrant issued by a magistrate upon a showing of probable cause. The

---

[4] Title 8 U. S. C. § 1357 (a) provides in pertinent part:
"Any officer or employee of the [Immigration and Naturalization] Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

.          .          .          .          .

"(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . ."

The Court of Appeals also relied on 8 CFR § 287.1, which in relevant part provides:
"(a)(2) *Reasonable. distance.*  The term 'reasonable distance,' as used in section 287 (a) (3) of the Act, means within 100 air miles from any external boundary of the United States or any shorter distance which may be fixed by the district director, or, so far as the power to board and search aircraft is concerned, any distance fixed pursuant to paragraph (b) of this section."

Amendment's overriding prohibition is nevertheless against "unreasonable" searches and seizures; and the legality of searching, without warrant and without probable cause, individuals and conveyances seeking to enter the country has been recognized by Congress and the courts since the very beginning. *Boyd* v. *United States,* 116 U. S. 616 (1886), said as much; and in *Carroll* v. *United States,* 267 U. S. 132, 154 (1925), the Court repeated that neither warrant nor probable cause was required to authorize a stop and search at the external boundaries of the United States: "Travelers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." This much is undisputed in this case. Persons and their effects may be searched at the border for dutiable articles or contraband. Conveyances may be searched for the same purposes, as well as to determine whether they carry aliens not entitled to enter the country. Neither, apparently, is it disputed that warrantless searches for aliens without probable cause may be made at fixed checkpoints away from the border.

The problem in this case centers on the roving patrol operating away from, but near, the border. These patrols may search for aliens without a warrant if there is probable cause to believe that the vehicle searched is carrying aliens illegally into the country. But without probable cause, the majority holds the search unreasonable, although at least one Justice, MR. JUSTICE POWELL, would uphold searches by roving patrols if authorized by an area warrant issued on less than probable cause in the traditional sense. I agree with MR. JUSTICE POWELL that such a warrant so issued would satisfy the Fourth Amendment, and I would expect that such warrants would be readily issued. But I disagree with him

and the majority that either a warrant or probable cause is required in the circumstances of this case. As the Court has reaffirmed today in *Cady* v. *Dombrowski, post,* p. 433, the governing standard under the Fourth Amendment is reasonableness, and in my view, that standard is sufficiently flexible to authorize the search involved in this case.

In *Terry* v. *Ohio,* 392 U. S. 1 (1968), the Court proceeding under the "general proscription against unreasonable searches and seizures," *id.,* at 20 (footnote omitted), weighed the governmental interest claimed to justify the official intrusion against the constitutionally protected interest of the private citizen. *Id.,* at 20–21. The " 'need to search' " was balanced " 'against the invasion which the search . . . entails,' " quoting from *Camara* v. *Municipal Court,* 387 U. S. 523, 534–535, 536–537 (1967). *Terry, supra,* at 21. In any event, as put by Mr. Chief Justice Warren, the "question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an *unreasonable* search and seizure." *Id.,* at 9 (emphasis added).

Warrantless but probable-cause searches of the person and immediate surroundings have been deemed reasonable when incident to arrest, see *Chimel* v. *California,* 395 U. S. 752 (1969); and in *Terry,* the stop of a suspected individual and a pat-down for weapons without a warrant were thought reasonable on less than traditional probable cause. In *Camara* v. *Municipal Court, supra,* an inspection of every structure in an entire area to enforce the building codes was deemed reasonable under the Fourth Amendment without probable cause, or suspicion that any particular house or structure was in violation of law, although a warrant, issuable without probable cause, or reasonable suspicion of a violation, was required with respect to nonconsenting property owners. Also, in *Colonnade Catering Corp.* v. *United*

*States,* 397 U. S. 72 (1970), MR. JUSTICE DOUGLAS, writing for the Court and recognizing that the Fourth Amendment bars only unreasonable searches and seizures, ruled that the historic power of the Government to control the liquor traffic authorized warrantless inspections of licensed premises without probable cause, or reasonable suspicion, not to check on liquor quality or conditions under which it was sold, but solely to enforce the collection of, the federal excise tax.[5]   *United States* v. *Biswell,* 406 U. S. 311 (1972), involved the Gun Control Act of 1968 and its authorization to federal officers to inspect firearms dealers.   The public need to enforce an important regulatory program was held to justify random inspections of licensed establishments without warrant and probable cause.

The Court has been particularly sensitive to the Amendment's broad standard of "reasonableness" where, as in *Biswell* and *Colonnade,* authorizing statutes permitted the challenged searches.   We noted in *Colonnade* that "Congress has broad power to design such powers of inspection under the liquor laws as it deems necessary

---

[5] In *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72 (1970), the conviction was set aside because it was thought that Congress, with all the authority it had to prescribe standards of reasonableness under the Fourth Amendment, had not intended federal inspectors to use force in carrying out warrantless, non-probable-cause inspections.   In dissent, THE CHIEF JUSTICE, joined by Justices Black and STEWART, would have sustained the search, saying: "I assume we could all agree that the search in question must be held valid, and the contraband discovered subject to seizure and forfeiture, unless (a) it is 'unreasonable' under the Constitution or (b) it is prohibited by a statute imposing restraints apart from those in the Constitution.   The majority sees no constitutional violation; I agree." *Id.,* at 78.

In a separate dissent Mr. Justice Black, joined by THE CHIEF JUSTICE and MR. JUSTICE STEWART, also emphasized that the ultimate test of legality under the Fourth Amendment was whether the search and seizure were reasonable. *Id.,* at 79–81.

to meet the evils at hand," 397 U. S., at 76; and in *Biswell* we relied heavily upon the congressional judgment that the authorized inspection procedures played an important part in the regulatory system. 406 U. S., at 315–317. In the case before us, 8 U. S. C. § 1357 (a)(3), authorizes Border Patrol officers, without warrant, to search any vehicle *for aliens* "within a reasonable distance from any external boundary of the United States" and within the distance of 25 miles from such external boundary to have access to private lands, but not dwellings "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . ." At the very least, this statute represents the considered judgment of Congress that proper enforcement of the immigration laws requires random searches of vehicles without warrant or probable cause within a reasonable distance of the international borders of the country.

It is true that "[u]ntil 1875 alien migration to the United States was unrestricted." *Kleindienst* v. *Mandel,* 408 U. S. 753, 761 (1972). But the power of the National Government to exclude aliens from the country is undoubted and sweeping. "That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens, it would be to that extent subject to the control of another power." *Chae Chan Ping* v. *United States,* 130 U. S. 581, 603–604 (1889). "The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively . . . is settled by our previous ad-

judications." *Lem Moon Sing* v. *United States,* 158 U. S. 538, 547 (1895). See also *Fong Yue Ting* v. *United States,* 149 U. S. 698, 711 (1893); *Yamataya* v. *Fisher,* 189 U. S. 86, 97–99 (1903); *United States ex rel. Turner* v. *Williams,* 194 U. S. 279, 289–290 (1904); *Oceanic Steam Navigation Co.* v. *Stranahan,* 214 U. S. 320, 335–336 (1909); *United States ex rel. Volpe* v. *Smith,* 289 U. S. 422, 425 (1933).

Since 1875, Congress has given "almost continuous attention . . . to the problems of immigration and of excludability of certain defined classes of aliens. The pattern generally has been one of increasing control . . . ." *Kleindienst* v. *Mandel, supra,* at 761–762. It was only as the illegal entry of aliens multiplied that Congress addressed itself to enforcement mechanisms. In 1917, immigration authorities were authorized to board and search all conveyances by which aliens were being brought into the United States. Act of Feb. 5, 1917, § 16, 39 Stat. 886. This basic authority, substantially unchanged, is incorporated in 8 U. S. C. § 1225 (a).

In 1946, it was represented to Congress that "[i]n the enforcement of the immigration laws it is at times desirable to stop and search vehicles within a reasonable distance from the boundaries of the United States and the legal right to do so should be conferred by law." H. R. Rep. No. 186, 79th Cong., 1st Sess., 2 (1945). The House Committee on Immigration and Naturalization was "of the opinion that the legislation is highly desirable," *ibid.,* and its counterpart in the Senate, S. Rep. No. 632, 79th Cong., 1st Sess., 2 (1945), stated that "[t]here is no question but that this is a step in the right direction." The result was express statutory authority, Act of Aug. 7, 1946, 60 Stat. 865, to conduct searches of vehicles for aliens within a reasonable distance from the border without warrant or possible cause. Moreover, in the Immigration and Nationality Act of 1952, 66 Stat.

163, Congress permitted the entry onto private lands, excluding dwellings, within a distance of 25 miles from any external boundaries of the country "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . ." § 287 (a)(3), 66 Stat. 233.

The judgment of Congress obviously was that there are circumstances in which it is reasonably necessary, in the enforcement of the immigration laws, to search vehicles and other private property for aliens, without warrant or probable cause, and at locations other than at the border. To disagree with this legislative judgment is to invalidate 8 U. S. C. § 1357 (a)(3) in the face of the contrary opinion of Congress that its legislation comported with the standard of reasonableness of the Fourth Amendment. This I am quite unwilling to do.

The external boundaries of the United States are extensive. The Canadian border is almost 4,000 miles in length; the Mexican, almost 2,000. Surveillance is maintained over the established channels and routes of communication. But not only is inspection at regular points of entry not infallible, but it is also physically impossible to maintain continuous patrol over vast stretches of our borders. The fact is that illegal crossings at other than the legal ports of entry are numerous and recurring. If there is to be any hope of intercepting illegal entrants and of maintaining any kind of credible deterrent, it is essential that permanent or temporary checkpoints be maintained away from the borders, and roving patrols be conducted to discover and intercept illegal entrants as they filter to the established roads and highways and attempt to move away from the border area. It is for this purpose that the Border Patrol maintained the roving patrol involved in this case and conducted random, spot checks of automobiles and other vehicular traffic.

The United States in this case reports that in fiscal year 1972, Border Patrol traffic checking operations located over 39,000 deportable aliens, of whom approximately 30,000 had entered the United States by illegally crossing the border at a place other than a port of entry. This was said to represent nearly 10% of the number of such aliens located by the Border Patrol by all means throughout the United States.[6]

Section 1357 (a)(3) authorizes only searches for aliens and only searches of conveyances and other property. No searches of the person or for contraband are authorized by the section. The authority extended by the statute is limited to that reasonably necessary for the officer to assure himself that the vehicle or other conveyance is not carrying an alien who is illegally within this country; and more extensive searches of automobiles without probable cause are not permitted by the section. *Roa-Rodriquez* v. *United States,* 410 F. 2d 1206 (CA10 1969); see *Fumagalli* v. *United States,* 429 F. 2d 1011, 1013 (CA9 1970). Guided by the principles of *Camara, Colonnade,* and *Biswell,* I cannot but uphold the judgment of Congress that for purposes of enforcing the immigration laws it is reasonable to treat the exterior boundaries of the country as a zone, not a line, and that there are recurring circumstances in which the search of vehicular traffic without warrant and without probable cause may be reasonable under the Fourth Amendment although not carried out at the border itself.

---

[6] In fiscal year 1972, 398,000 aliens who had entered the United States without inspection were located by Immigration and Naturalization officers; and of the 39,243 deportable aliens located through traffic checking operations, about one-third, 11,586, had been assisted by smugglers. In fiscal year 1972, 2,880 such smugglers were discovered through traffic checking operations. Ninety-nine percent of all aliens illegally entering the United States by land crossed our border with Mexico.

This has also been the considered judgment of the three Courts of Appeals whose daily concern is the enforcement of the immigration laws along the Mexican-American border, and who, although as sensitive to constitutional commands as we are, perhaps have a better vantage point than we here on the Potomac to judge the practicalities of border-area law enforcement and the reasonableness of official searches of vehicles to enforce the immigration statutes.

The Court of Appeals for the Ninth Circuit, like other circuits, recognizes that at the border itself, persons may be stopped, identified, and searched without warrant or probable cause and their effects and conveyances likewise subjected to inspection. There seems to be no dissent on this proposition. Away from the border, persons and automobiles may be searched for narcotics or other contraband only on probable cause; but under § 1357 (a)(3), automobiles may be stopped without warrant or probable cause and a limited search for aliens carried out in those portions of the conveyance capable of concealing any illegal immigrant. This has been the consistent view of that court.

In *Fumagalli* v. *United States, supra,* Fumagalli was stopped at a checkpoint in Imperial, California, 49 miles north of the international boundary. In the course of looking in the trunk for an illegal entrant, the odor of marihuana was detected and marihuana discovered. Fumagalli contended that the trunk of the automobile could not be examined to locate an illegal entrant absent probable cause to believe that the vehicle carried such a person. The court, composed of Judges Merrill, Hufstedler, and Byrne, rejected the position, stating that "[w]hat all of these cases make clear is that probable cause is not required for an *immigration* search within approved limits [footnote omitted] but is generally required to sustain the legality of a search for *contraband*

in a person's automobile conducted away from the international borders. . . . Appellant has confused the two rules in his attempt to graft the probable cause standards of the *narcotics* cases . . . onto the rules justifying immigration inspections . . . ." 429 F. 2d, at 1013. Among prior cases reaffirmed was *Fernandez* v. *United States,* 321 F. 2d 283 (1963), where an automobile was stopped 18 miles north of Oceanside, California, on Highway 101 at a point 60 to 70 miles north of the Mexican border. An inspection for illegally entering aliens was conducted, narcotics were discovered and seized, and the stop and seizure were sustained under the statute. The Immigration Service, it was noted, had been running traffic checks in this area for 31 years, many illegal entrants had been discovered there, and there were at least a dozen other such checkpoints operating along the border between the United States and Mexico.[7]

The Courts of Appeal for the Fifth and Tenth Circuits share the problem of enforcing the immigration laws along the Mexican-American border. Both courts agree with the Ninth Circuit that § 1357 (a)(3) is not void and that there are recurring circumstances where, as the statute permits, a stop of an automobile without warrant or probable cause and a search of it for aliens are constitutionally permissible.

In *United States* v. *De Leon,* 462 F. 2d 170 (CA5 1972), De Leon was stopped without warrant or probable cause,

---

[7] In the Court of Appeals for the Ninth Circuit, 8 U. S. C. § 1357 (a)(3) has also been sustained in, *e. g., Mienke* v. *United States,* 452 F. 2d 1076 (1971); *United States* v. *Marin,* 444 F. 2d 86 (1971); *Duprez* v. *United States,* 435 F. 2d 1276 (1970); *United States* v. *Sanchez-Mata,* 429 F. 2d 1391 (1970); *United States* v. *Avey,* 428 F. 2d 1159 (1970); *United States* v. *Miranda,* 426 F. 2d 283 (1970); and *United States* v. *Elder,* 425 F. 2d 1002 (1970). See also *Valenzuela-Garcia* v. *United States,* 425 F. 2d 1170 (1970), and *Barba-Reyes* v. *United States,* 387 F. 2d 91 (1967).

while driving on the highway leading north of Laredo, Texas, approximately 10 miles from the Mexican border. The purpose of the stop was to inspect for illegally entering aliens. De Leon opened the trunk as he was requested to do. A false bottom in the trunk and what was thought to be an odor of marihuana were immediately noticed and some heroin was seized. Judge Wisdom, writing for himself and Judges Godbold and Roney, concluded that:

> "Stopping the automobile ten miles from the Mexican border to search for illegal aliens was reasonable. *See* United States v. McDaniel, [463 F. 2d 129 (CA5 1972)]; United States v. Warner, 5 Cir. 1971, 441 F. 2d 821; Marsh v. United States, 5 Cir. 1965, 344 F. 2d 317, 8 U. S. C. §§ 1225, 1357; 19 U. S. C. §§ 482, 1581, 8 C. F. R. § 287.1 [1973]; 19 C. F. R. §§ 23.1 (d), 23.11 [1972]. Once the vehicle was reasonably stopped pursuant to an authorized border check the agents were empowered to search the vehicle, including the trunk, for aliens." *Id.*, at 171.

Similarly, *United States v. McDaniel*, 463 F. 2d 129 (CA5 1972), upheld a stop and an ensuing search for aliens that uncovered another crime. Judge Goldberg, with Judges Wisdom and Clark, was careful to point out, however, that the authority granted under the statute must still be exercised in a manner consistent with the standards of reasonableness of the Fourth Amendment. "Once the national frontier has been crossed, the search in question must be reasonable upon *all* of its facts, only one of which is the proximity of the search to an international border." *Id.*, at 133. This view appears to have been the law in the Fifth Circuit for many years.[8]

---

[8] *E. g., Kelly* v. *United States,* 197 F. 2d 162 (1952). See also *United States* v. *Bird,* 456 F. 2d 1023, 1024 (1972); *Ramirez* v.

The Court of Appeals for the Tenth Circuit has expressed similar views. In *Roa-Rodriquez, supra,* the automobile was stopped in New Mexico some distance from the Mexican border, the purpose being to search for aliens. Relying on the statute, the court, speaking through Judge Breitenstein, concluded that "[i]n the circumstances the initial stop and search for aliens were proper." *Id.,* at 1208. However, when it was determined by the officers that there were no occupants of the car illegally in the country, whether in the trunk or elsewhere, the court held that the officers had no business examining the contents of a jacket found in the trunk. The evidence in this case was excluded. The clear rule of the circuit, however, is that conveyances may be stopped and examined for aliens without warrant or probable cause when in all the circumstances it is reasonable to do so.[9]

Congress itself has authorized vehicle searches at a reasonable distance from international frontiers in order to aid in the enforcement of the immigration laws. Congress has long considered such inspections constitutionally permissible under the Fourth Amendment. So, also, those courts and judges best positioned to make intelligent and sensible assessments of the requirements of reasonableness in the context of controlling illegal entries into this country have consistently and almost without dissent come to the same conclusion that is embodied in the judgment that is reversed today.[10]

---

*United States,* 263 F. 2d 385, 387 (1959); and *Haerr* v. *United States,* 240 F. 2d 533, 535 (1957).

[9] *E. g., United States* v. *Anderson,* 468 F. 2d 1280 (1972); and *United States* v. *McCormick,* 468 F. 2d 68 (1972).

[10] Without having undertaken an exhaustive survey, in the 20 court of appeals cases I have noted, including the one before us, 35 different judges of the three Courts of Appeals found inspection

## II

I also think that § 1357 (a)(3) was validly applied in this case and that the search for aliens and the discovery of marihuana were not illegal under the Fourth Amendment. It was stipulated that the highway involved here was one of the few roads in California moving away from the Mexican border that did not have an established check station and that it is commonly used by alien smugglers to evade regular checkpoints. The automobile, when stopped sometime after midnight, was 50 miles along the road from the border town of Calexico, proceeding toward Blythe, California; but as a matter of fact it appears that the point at which the car was stopped was approximately only 20 miles due north of the Mexican border. Given the large number of illegal entries across the Mexican border at other than established ports of entry, as well as the likelihood that many illegally entering aliens cross on foot and meet prearranged transportation in this country, I think that under all the circumstances the stop of petitioner's car was reasonable, as was the search for aliens under the rear seat of the car pursuant to an official bulletin suggesting search procedures based on experience. Given a valid search of the car for aliens, it is in no way contended that the discovery and seizure of the marihuana were contrary to law.[11]

I would affirm the judgment of the Court of Appeals.

---

of vehicles for illegal aliens without warrant or probable cause to be constitutional. Only one judge has expressed a different view.

[11] The United States does not contend, see Tr. of Oral Arg. 29, and I do not suggest that any search of a vehicle for aliens within 100 miles of the border pursuant to 8 CFR § 287.1 would pass constitutional muster. The possible invalidity of the regulation and of 8 U. S. C. § 1357 (a)(3) in other circumstances is not at issue here.