**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roldan GUILLEN–LINARES, Sergio Delrio–Buentes, Tomas Gonzalez, Felix Valle, Raul Delrio–Boquet, and Raul Peralta, Defendants–Appellants.**

No. 78–5630.

United States Court of Appeals,
Fifth Circuit.

Jan. 15, 1981.

George L. Cardet, Miami, Fla., for Guillen–Linares.

Anthony F. Gonzalez, Bennie Lazzara, Jr., Richard Lazzara, Tampa, Fla., for Delrio–Buentes Gonzalez, Valle and Delrio–Boquet.

Joseph H. Ficarrotta, Tampa, Fla., for Peralta.

Marvin L. Rudnick, Asst. U. S. Atty., Tampa, Fla., for the U.S.

Before COLEMAN, Chief Judge, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

On April 27, 1978, the Coast Guard boarded a shrimping vessel, the Miss Port Canaveral, while that ship was anchored in Tampa Bay. The boarding party discovered a significant quantity of marijuana on the Miss Port Canaveral, and arrested all those aboard. Soon thereafter, the crew of the Miss Port Canaveral was tried and convicted of conspiracy to possess marijuana with intent to distribute, 21 U.S.C. § 846 (1976), and of possession of marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The crew appeals from these convictions, alleging error on the part of the district court in failing to suppress, on fourth amendment grounds, the seized marijuana, and in denying the crew's motion for disqualification of the trial judge.

While retaining jurisdiction, we remand this case to the district court for further findings essential to a thorough resolution of this appeal.

I

On the morning of April 27, 1978, the U. S. Customs Service in Tampa, Florida, contacted Lieutenant Stephen Venckus, Operations Officer for the U. S. Coast Guard's St. Petersburg Group. At this time, the St. Petersburg Group was responsible for Coast Guard duties in the Tampa Bay area. Cus-

toms informed Venckus that the Customs Service was maintaining a surveillance program in Tampa Bay, and that the Service might need Coast Guard assistance in further surveillance and a possible boarding of a particular vessel, later identified as the Miss Port Canaveral, some time later that day. Record , vol. IV at 90–91. Customs stated that this surveillance involved a case they had been working on for some time, *id.* at 98; Customs did not elaborate, however, any further grounds for suspicion concerning the activities of the Miss Port Canaveral. Record, vol. V at 130–131. The Miss Port Canaveral was anchored in upper Tampa Bay, approximately two miles outside of the nearest shipping lane, record, vol. VII at 40, and remained anchored at this location all day. The record indicates that the Coast Guard did not know how long the Miss Port Canaveral had been anchored there, nor when she had entered the confines of Tampa Bay. Record, vol. VII at 58, 69. Furthermore, the record does not indicate whether the Customs Service knew when the Miss Port Canaveral had anchored or when she had entered Tampa Bay.

Coast Guard and Customs remained in contact throughout the morning and afternoon of April 27. These communications took the form of updates on Customs' surveillance. It is clear from the record that Customs did not communicate any indication of urgency concerning their ongoing activities. Record, vol. IV at 101–102. At approximately 12:00 noon the Coast Guard contacted Customs and asked for further indication of Customs' needs, as the Coast Guard vessel which had been put on alert in regard to the Miss Port Canaveral surveillance had a preexisting commitment for 4:00 p. m. that day. *Id.* at 104. The Coast Guard contacted Customs again at about 1:30 p. m., and at that time Customs advised the Coast Guard to proceed to the vicinity of the Miss Port Canaveral's anchorage, to maintain surveillance of the shrimping vessel, and to advise Customs of what the Coast Guard observed. *Id.* at 104–105. At no time during the course of these communications did Customs inform the Coast Guard of the facts underlying Customs' suspicions concerning the Miss Port Canaveral. *Id.* at 106–107.

Soon thereafter, the Coast Guard arrived in the area of the Miss Port Canaveral's anchorage and began surveillance. The district court found that this surveillance revealed "nothing inherently suspicious about the configuration or presence of the vessel [the Miss Port Canaveral] at the time in question...." Record, vol. V at 132. The Coast Guard did observe, however, that the Miss Port Canaveral had "Florida" painted on her stern, thus indicating that she was an American flag vessel. Record, vol. IV at 24. At about 3:15 p. m., Customs advised the Coast Guard to board the Miss Port Canaveral. *Id.* at 112. The Coast Guard then proceeded to board. During the course of that boarding, Petty Officer Kellogg of the Coast Guard had occasion to go below decks in search of the shrimper's main beam identification number. While below decks he saw bales of what he believed to be marijuana. He thereupon put the Miss Port Canaveral's crew under arrest. A subsequent test indicated that the bales did contain marijuana. During the course of these events, the Coast Guard maintained contact with Customs. Soon thereafter, a Customs officer came aboard the Coast Guard vessel. *Id.* at 128.

## II

Both Officer Kellogg and Lieutenant Venckus testified below that the boarding of the Miss Port Canaveral was conducted pursuant to 14 U.S.C. § 89(a) (1976),[1] the

1. Section 89(a) reads:
   Law enforcement
   (a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquires to those on board, examine the ship's documents and

statute authorizing the Coast Guard to board and inspect vessels "subject to the jurisdiction, or to the operation of any Law, of the United States." Record, vol. IV at 20, 114–115. Appellants assert, however, that in this instance the Coast Guard was, pursuant to 14 U.S.C. § 89(b),[2] acting solely as agents of the Customs Service. Therefore, they contend, the boarding of the Miss Port Canaveral was purely an operation of the Customs Service and could only be conducted under the authority of 19 U.S.C. § 1581(a)[3] the Customs Service boarding statute.

The district court acknowledged that "the Coast Guard was there, to be sure, at the *suggestion or direction* of the Customs and made a boarding, if you will, under the guise of an 89–A inspection and document boarding . . ." Record, vol. 5 at 135 (emphasis added). It is clear, however, that the district court believed that the Coast Guard's behavior was to be measured against, and upheld under, the requirements of section 89(a) despite the close association with the Customs Service. *Id.* at 133–138. This decision was reached without a clear articulation of whether the boarding of the Miss Port Canaveral was, in the final analysis, accomplished by officers acting in the capacity of Coast Guardsmen or acting in the capacity of Customs Agents: "[T]he fact that the Coast Guard boarded this vessel under 89–A at the sole *suggestion or direction*, if counsel prefers that word–it seems to me it's one and the same in this context–of the Customs service, does not per se invalidate the search under Section 89." *Id.* at 133–134. (emphasis added).

In our view, however, the alternative capacities of the officers upon boarding the Miss Port Canaveral may prove *not* to be one and the same thing. If they boarded under their authority as agents of the Customs Service, they might be subject to the standards of section 1581(a) and those constitutional inhibitions potentially applicable in such circumstances. *See United States v. Whitaker*, 592 F.2d 826, 829 (5th Cir.), *cert. denied* 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979). *See also Almeida–Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Johnson*, 588 F.2d 147, 153–155 (5th Cir. 1979). *But see United States v. Warren*, 578 F.2d 1058, 1067–70 (5th Cir. 1978) (en banc), *modified on other grounds*, 612 F.2d 887 (5th Cir.) (en banc), *cert. denied* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815

papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

2. Section 89(b) reads:

(b) The officers of the Coast Guard insofar as they are engaged, pursuant to the authority contained in this section, in enforcing any law of the United States shall:

(1) be deemed to be acting as agents of the particular executive department or independent establishment charged with the administration of the particular law; and

(2) be subject to all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law.

3. Section 1581(a) reads:

§ 1581. Boarding vessels

(a) Customs officers

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs–enforcement area established under the Anti–Smuggling Act [19 U.S.C. 1701 et seq.], or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

(1980). If they boarded as Coast Guardsmen, the standards of 14 U.S.C. § 89(a) would apply.

In *United States v. Hillstrom*, 533 F.2d 209 (5th Cir. 1976), *cert. denied* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), this court was faced with the question of the validity of a Coast Guard boarding of a vessel at the suggestion of drug enforcement officers. In that case we held that:

> In light of the Coast Guard's responsibility under 14 U.S.C.A. § 89(a) to prevent the violation of United States law, the defendants are entirely unwarranted in their suggestion that prior suspicion of the presence of drugs, or the *suggestion* by a drug enforcement agency that inspection be made, tainted the validity of the safety and documentation inspection.

*Id.* at 211 (emphasis added). Applying this law to the facts before us, we perceive a distinction between the notion of a *suggestion* on the part of the Customs Service, and a *direction* on their part. Indeed, this distinction may be determinative of whether the boarding party in this case was acting as a branch of the Customs Service or as a part of the Coast Guard. Furthermore, we believe this to be the kind of determination which should be made in the first instance by the district court.

Therefore, while retaining jurisdiction of this case, we remand to the district court for a specific finding of whether the individuals in the boarding party that seized the marijuana aboard the Miss Port Canaveral were acting in the capacity of Customs agents or acting in the capacity of Coast Guardsmen. The district court shall have sixty (60) days to make this finding and certify the same to this court.

REMANDED in part.