**UNITED STATES of America**
**v.**
**Rodolfo Trinidad FUENTES.**
**Crim. No. 74–B–69.**

United States District Court,
S. D. Texas,
Brownsville Division.

June 13, 1974.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., John Patrick Smith and Charles F. Sandoval, Asst. U. S. Attys., Brownsville, Tex., for the Government.

Knox Jones, McAllen, Tex., for defendant.

## MEMORANDUM AND ORDER

GARZA, District Judge.

The Defendant Rodolfo Trinidad Fuentes is charged by Grand Jury indictment of possessing approximately 660 pounds of maribuana, with intent to distribute, in violation of 21 U.S.C. 841(a)(1). To this charge, he has entered a plea of not guilty and has filed a Motion to Suppress.

On May 10, 1974, a hearing was held on Defendant Fuentes' motion. The government called two witnesses, Max W. Ramee, the Assistant Chief of the U. S. Border Patrol Station at McAllen, Texas, and R. D. Kieffe, the U. S. Border Patrolman who made the checkpoint search and arrest. The Defendant did not call any witnesses and rested following the close of the government's evidence.

Apparently there is a feeling by the Border Patrol that their operations of checkpoint searches will soon be significantly effected by the expansion of the landmark holding of Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), by the Fifth and Ninth Circuits. This feeling is well founded in light of the recent Fifth Circuit case of United States v.

Speed and Rainer, 489 F.2d 478 (5th Cir. 1973), and United States v. Bowen, 500 F.2d 960 (9th Cir. 1974); United States v. Peltier, 500 F.2d 985 (9th Cir., 1974). In anticipation of this oncoming assault, the government elicited extensive testimony from Assistant Chief Ramee, who did not participate in the arrest, on the nature and scope of the La Gloria checkpoint in question. He testified that the Border Patrol operates a border patrol checkpoint on FM 1017, nine miles northwest of La Gloria, Texas. This checkpoint is approximately 32 miles from the United States-Mexican border and is in an area and along a route commonly used for the smuggling of aliens and contraband into the interior of the country. Toward the south, FM 1017 connects with at least three other roads that run directly to the Rio, Grande River: FM 755, FM 681 and US 281. A quick reference to a map shows that the other two principal checkpoints in this area, Falfurrias and Sarita, are similarly located in strategic positions, and the reasoning advanced in this Memorandum underpinning the legality of the La Gloria checkpoint can also be applied to the Falfurrias and Sarita checkpoints.

Assistant Chief Ramee testified that the checkpoint is normally manned for one eight-hour shift a day, but that it cannot be manned around the clock because of manpower shortages and weather conditions. He also stated that it is the policy of the Border Patrol Agency to stop everyone travelling out of the Valley who passes by this checkpoint to make an immigration check.

Under a rather extensive cross examination, Assistant Chief Ramee stated that he did not know if anglos passing through this checkpoint to the north were simply "waved on" after a cursory glance by the operating agent and re-emphasized that the policy was to stop everyone. It was also brought out on cross examination that the checkpoint is not always in the same location. It is moved up and down the same stretch of highway and, hence, may be found on different locations on different days, but always in the same area.

Border Patrolman R. D. Kieffe testified that on February 13, 1974, at 8:15 in the evening, he was manning the checkpoint when he was approached by a 1970 Chrysler driven by the Defendant Fuentes, who was accompanied by his son, Ramiro Fuentes. As the car rolled to a stop, he noticed that it was riding low in the back; while talking to the occupants of the car and visually inspecting the interior, he detected the scent of marihuana about the car, an odor that he had smelled on many prior occasions. Agent Kieffe then requested the driver to open the trunk of the car, but the driver stated that he did not have the key. Agent Kieffe noticed that the key to the trunk was with the ignition key. On checking in the trunk, Agent Kieffee found, in plain view, 660 pounds of marihuana in brick form.

The Defendant has urged upon this Court the position that this warrantless search does not qualify as a border search under the holding of Almeida-Sanchez, supra, and, therefore, must be judged under the standards of probable cause. He further contends that there was no probable cause for this search and that the search and seizure is, therefore, in violation of his Fourth Amendment rights. In addition to the case of Almeida-Sanchez v. United States, supra, he has cited to the Court the recent Fifth Circuit cases of United States v. Richard Glynn Byrd, 483 F.2d 1196 (CA 5 1973); United States v. Speed and Rainer, supra; and United States v. Lonabaugh, 494 F.2d 1257 (5th Cir. 1973). Finally, he has cited to the Court the recent Ninth Circuit en banc decision of United States v. Bowen, supra.

From the onset, this Court wishes to make clear that it is proceeding on the theory that the initial stop was made for the purpose of visually inspecting the passenger section of the car and ascertaining the citizenship of the occupants,

pursuant to 8 U.S.C. § 1357. Thus, this Court must pass on the legality under the Fourth Amendment of not one, but two searches: the initial inspection and the subsequent search of the trunk. It is the opinion of this Court that the first search, the inspection, was legal, as the checkpoint was, in fact, the functional equivalent of the border, and it was reasonable to stop cars passing the checkpoint to inspect the citizenship of all passersby and search for aliens. Consequently, the second search—the opening of the trunk—was also legal, as it was based on probable cause derived from the first search and was attended by exigent circumstances.

■ As was pointed out in the *Almeida-Sanchez* decision, border searches may be carried out many miles from the border if they are conducted at a point that would qualify as a functional equivalent of a border. The Court, by way of illustration, specifically mentioned "searches at an established station near the border at a point marking the confluence of two or more roads that extended from the border might be functional equivalents of border searches". *Almeida-Sanchez v. United States, supra*, at 272, 273. In the wake of *Almeida-Sanchez*, a significant question has been raised over what is and what is not an "established", "fixed" or "permanent" checkpoint. It is the feeling of this Court that the use of words "established" and "fixed", with reference to checkpoints, was nothing more than a reaction to the capricious and whimsical search that was before that Court. These words do not refer, as it may seem, to the character of the highway location where the search is carried out, but rather to the manner in which it is carried out. This Court simply cannot believe that the Supreme Court of the United States meant to say that the Fourth Amendment rights here involved rise and fall with the presence or absence of "permanent" electrical outlets, large steel signs and concrete buildings. What the Supreme Court found offensive was the arbitrariness of the search that was directed against the Defendant Almeida-Sanchez. This arbitrariness is overcome by a search that is directed at everyone passing a particular point. It is the understanding of this Court that phrases in *Almeida-Sanchez*, such as "established" and "fixed", are references to checkpoints which are carried out in the same general area of a highway and which are directed at everyone passing that point toward the interior of the country. It is the spirit of this understanding that brings the La Gloria checkpoint within the notion of the type of functional border equivalent suggested by *Almeida-Sanchez*: an "established station near the border at a point marking the confluence of two or more roads that extend from the border". Since the La Gloria checkpoint was the functional equivalent of the border, Agent Kieffe had the right to make the initial stop and inspection, just as if he were at the border itself.

There is an additional reason why this checkpoint should be considered a functional equivalent. By virtue of handling the Brownsville Division of the Southern District of Texas for over thirteen years and having lived in the Rio Grande Valley all my life, I have become intimately acquainted with immigration methods and problems peculiar to border areas. This Court wishes to explain more fully some of these problems and methods, for this Court is convinced that a more complete comprehension of them is necessary to understand why the La Gloria checkpoint and those similarly situated are border equivalents and why searches carried out at such operations are reasonable.

There are three types of aliens passing through the Rio Grande Valley. The first class consists of legal entrants who have permission to travel throughout the country for extended periods of time. The second class is formed by legal entrants whose length of stay and geographic range are quite restricted. This class is principally made up of

Mexican citizens who carry I–186 border crossing cards, which allow the bearer to visit any place lying within an imaginary zone which extends twenty-five miles from the border, for up to seventy-two hours. The third class consists of the legendary *mojados*, who literally swim the river, often under the cover of night.

At the request of this Court, the Immigration and Naturalization Service has provided this Court with two affidavits concerning the use and misuse of the I–186 cards, copies of which are appended and are herein incorporated for all purposes. They will be referred to by reference· to the office from which they were issued, McAllen and San Antonio. As reflected in the McAllen affidavit, it is a common practice for aliens to use the I–186 cards to legally cross the river at one of the seven international bridges located in the Brownsville Division, and thereafter try to immigrate beyond the twenty-five mile zone into the interior of the country. At the La Gloria checkpoint (referred to as "Rio Grande City" in the affidavit), there were 116 apprehensions of aliens carrying I–186 cards, who were trying to infiltrate to the interior of the country in fiscal 1973, and almost 600 apprehensions at all three Valley checkpoints. Significant as they are, these figures only scratch the surface of the problem. This Court wishes to take judicial notice of the fact that it is also common practice for Mexican aliens to mail the card back to Mexico, before attempting to proceed to the interior, to avoid the confiscation of the card in the event that the alien is caught. Hence, many of the 2,472 aliens apprehended at the traffic checkpoints in the Valley who did not have the I–186 cards on them, no doubt used the cards to gain initial entry into the twenty-five mile zone. Many of the I–186 aliens come to the United States to avail themselves of the merchant stores in the Valley, and these people form an important segment of the retail economy. But there are a significant number, at least 600 and perhaps as high as 3,063 a year, who use these cards to cross the border with the idea of heading north to enter the American labor market and, thereafter, are caught at the traffic checkpoints. To those that would vanish into the Latin communities in the north, the La Gloria checkpoint is really a "second river", where they must present additional documents to gain unrestricted entrance to the interior of the country.

One might argue that the potential problem is not as large as this Court suggests, as the McAllen affidavit figures show less than 600 checkpoint apprehensions of I–186 aliens. Such reasoning simply misses the point. As indicated above, 600 is a low figure because of the mail-back technique. Furthermore, it is the existence of the checkpoints that keeps the flow at a manageable level. The intense pressure to immigrate is reflected by the Ninth Circuit in United States v. Bowen, *supra*, where the *en banc* panel estimated that there are presently somewhere between 650,000 and 850,000 illegal Mexican aliens in the country. United States v. Bowen, *supra*, at 974. But behind these people who have illegally, but successfully, penetrated our interior, stand millions whose movements must be regulated if we are to keep any sort of rein on the problem. As reflected by the San Antonio affidavit, there were 19,023,908 non-immigrant crossings at the seven international bridges located in the Brownsville Division. A non-immigrant alien is one who is a citizen of another country who crosses the bridge for purposes other than immigrating to the United States. Of this figure, ninety-one (91%) per cent, or approximately 17,300,000 aliens gained entrance to the twenty-five mile zone by use of the alien crossing card and could not legally travel out of the zone.

Along the same line of reasoning, it is easy to see that, with regard to those who swim the river and then try to make their way north on public conveyance or by resorting to smugglers, the checkpoint is the first time that they

come under the scrutiny of the Immigration and Naturalization Service, and in a real sense the checkpoint, because of its strategic location, serves the same function as the several international bridges that span the Rio Grande.

■ Considering all of the above, it is clear to this Court that the La Gloria checkpoint is a functional equivalent from two points of view. Under the *Almeida-Sanchez* rationale, as understood by this Court, it is a permanent checkpoint, in that it is strategically located, non-roving and is directed at everyone who passes through it. In addition, under the "second river" theory, the checkpoint is a necessary barrier to which all passing through must present themselves and must prove, on request, their right to travel beyond the twenty-five mile zone into the interior.

■■ This Court is cognizant of the fact that reasonableness is the guiding principle of warrantless searches carried out under the Fourth Amendment, and that in determining reasonableness, the needs of society must be balanced with the rights of individuals vital to our concept of liberty. When a United States citizen presents himself to one of the international bridges and is allowed to enter the country, he has the right to travel anywhere he chooses. However, it does not appear to be widely held knowledge among either the citizenry or the judiciary that the American crossing the river steps into a zone to which are also admitted tens of thousands of aliens daily who, unlike their American counterparts, do not have the same right to travel anywhere in our nation and must remain inside the twenty-five mile zone. The only way to ferret out those that have the right to travel out of the zone from those that must remain within the zone is to check everyone soon after they have left the zone. Viewed in this posture, the checkpoints bear a rational relationship to a legitimate governmental interest. Of course Congress could do away with the I–186 border passes, but to do so would surely create a sore in American-Mexican relations, as well as wreak havoc on our local economy, and the country would still be faced with the problems of those who swim the Rio Grande to gain entry into the United States. Balancing the very minor intrusion into our Fourth Amendment freedoms with the all but impossible task that would be placed on the Immigration and Naturalization Service by checkpointless regulation of the flow of aliens, I find that these checkpoints are not an affront to the reasonableness requirement of the Fourth Amendment; to the contrary, they are the very voice of reason. If the Immigration and Naturalization Service is to be deprived of this tool of law enforcement, then we had better be prepared to spend tens of millions of dollars annually to assure that those who are prone to violate our immigration laws are caught at the river's edge when they land. This Court cannot believe that this was the intended holding of Almeida-Sanchez v. United States.

Counsel has cited to the Court the case of United States v. Speed and Rainer, *supra*, wherein the Fifth Circuit reversed a conviction based on evidence obtained from the Falfurrias checkpoint. The District Court in that case characterized the checkpoint as "non-permanent", and the Fifth Circuit panel seized upon the characterization to reverse the District Court with the following language:

"*Almeida-Sanchez*, if it has not answered all the questions about this area of the law, has at least given new focus to the inquiries. We must now ask if a search occurred either at the border or at the functional equivalent thereof. 413 U.S. at 2539, 93 S.Ct. at 271, 37 L.Ed.2d at 602. If not, then it is not a border search. . ."

"Proximity to the border is not [enough]. . . . [T]he searching officers must know or have a reasonable suspicion that the very individual or thing to be searched has itself just

crossed the border." (Quoting from United States ·v. Lonabaugh, *supra*.)

"In *Almeida-Sanchez*, a roving border patrol searched a car on an east-west highway about 25 miles from the border. In this case, we have a temporary checkpoint located on a north-south highway between 65 and 75 miles from the border. Neither search was at the border or its functional equivalent. . ."

"The distinction between a checkpoint and a roving patrol is not important. There appears to be little difference between the interference with domestic traffic caused by patrols and that caused by temporary checkpoints which may be moved about at the whim of the agents who operate them."

"Thus, what occurred in this case is essentially identical to the searches in *Almeida-Sanchez* and *Byrd*. The only connection to the border which could justify any of the searches was that they fell within the ambit of 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.1, and that similar searches in the area had produced evidence of illegal activity. Neither a Congressional statute nor praise for the results of a certain investigative technique can justify an otherwise illegal search and seizure. The convictions of both appellants are

*Reversed.*"

A reading of the District Court's opinion, United States v. Speed and Rainer, written by the Honorable Owen D. Cox of the Corpus Christi Division of our Court, Cr. No. 72–C–70, shows that the checkpoint was non-permanent, in that it was not manned at all hours of the day and was shifted up and down the same general stretch of the highway, in order that its effectiveness in detecting illegal aliens not be diminished. Though its exact location might be called "whimsical", in that it was not always the same number of miles from the border, there is no finding one way or the other by the District Court, or comment by the Fifth Circuit that it

was whimsical in the sense that it stopped travellers in an arbitrary fashion and did not stop everyone. It is this type of whim that *Almeida-Sanchez* condemned.

This Court, therefore, finds that the case of United States v. Speed and Rainer, *supra*, is not controlling for two reasons: first, the *Speed, Rainer* decision limits its consideration of "whim" to the geographical sense and does not address the question of whim with respect to those searched; and second, the decision deals with a checkpoint which the Court found to be a non-border equivalent, whereas, in the case before this Court, the checkpoint involved is a border equivalent within the meaning of *Almeida-Sanchez*.

It should be further noted that there is considerable doubt in the mind of this Court as to whether *Almeida-Sanchez*, which is the basis of *Speed, Rainer*, can in fact be relied upon in overturning a conviction based on a checkpoint classed as "temporary" in the geographic sense. It may be significant to note that Justice Powell cast the swing vote of the *Almeida-Sanchez* decision; in his concurring opinion, he specifically states that the issue of the constitutionality of "temporary" checkpoint searches was not before the Court. *Almeida-Sanchez*, *supra*, at 276.

Finally, with respect to the Defendant's contention that *Speed, Rainer* is a definitive holding, this Court would note that the opinion was written by Judge Lewis R. Morgan and was delivered on December 28, 1973. Yet in United States v. Merla, 493 F.2d 910, (5th Cir. 1974), Judge Morgan participated in a Per Curiam opinion concerning the Sarita checkpoint, which is identical to the Falfurrias checkpoint, wherein the panel implies that the question of border equivalency of that checkpoint is still an open one.

Counsel had also cited to the Court the case of United States v. Lonabaugh, *supra*, and United States v. Byrd, *supra*, and United States v. Bowen, *supra*. In

*Lonabaugh,* the critical issues were the border equivalency of an airport and the presence or absence of exigent circumstances to search a detained suitcase. In *Byrd,* the Court had before it a roving Border Patrol search. Both of these cases are factually distinguishable from the search before this Court.

The *Bowen* case presents a larger problem. In *Bowen,* the Ninth Circuit had originally affirmed Per Curiam the narcotic conviction arising out of a checkpoint search in United States v. Bowen, 462 F.2d 347 (CA 9 1972). The case was appealed to the Supreme Court, who vacated the Ninth Circuit opinion and ordered that case remanded for consideration in light of Almeida-Sanchez v. United States, *supra.* Bowen v. United States, 413 U.S. 915, 93 S.Ct. 3069, 37 L.Ed.2d 1038 (1973). On remand, the Ninth Circuit took the case up *en banc* and held 7 to 6 that the search was clearly illegal under the *Almeida-Sanchez* rationale. The effect of *Bowen* is to disqualify all interior highway checkpoints of this nature as functional equivalents of the border and require probable cause for all searches carried out at "fixed" highway checkpoints. While this Court is not bound by the *Bowen* decision, it wishes to consider it in light of the similarity of the factual and legal issues raised to those in the case at bar. Bowen was stopped at a fixed checkpoint forty-nine highway miles from the border, on a road that leads directly to the border itself. The searching officer was looking inside the camper for aliens, when he detected the odor of marihuana and later found 365 pounds of marihuana. The *en banc* majority held that this search was illegal under *Almeida-Sanchez.* The marihuana search seems to have been made on probable cause, but the facts which gave rise to the probable cause were fruits of the poisonous tree, because in "plain view" theory, the sensing officer must be legally located in the position from which he gains his inadvertent perceptions upon which his probable cause is based. Under this rationale, the implicit holding of *Bowen* is that the Border Patrol did not have the right to be in the camper to make the initial search for aliens. He lacked this right because the checkpoint in question failed to have the factual setting to be a border equivalent, as there was no showing that a high per cent of the people who travelled the road had just crossed the border and the checkpoint was not an interior port of entry in the same sense as the St. Louis airport would be.

From the onset, this Court wishes to direct attention to the dissenting opinion of Judge J. Clifford Wallace, who focuses on the above cited portion of Justice Powell's opinion in *Almeida-Sanchez,* wherein Justice Powell specifically limits *Almeida-Sanchez* to the roving search before that Court. As stated before, this Court is convinced that the holding of *Almeida-Sanchez* is a narrow one and has been joined in this feeling by the Fifth Circuit, United States v. Byrd, *supra,* and by Chief Judge Ben C. Connally of the Southern District of Texas, who, like the undersigned, is widely versed in subject of alien control in border areas, in his Memorandum and Order of May 13, 1974, in United States v. William Christian Boecker, Criminal No. 74–L–27, in the Laredo Division of this Court. But aside from this serious reservation, this Court notes, as is pointed out in the majority opinion in *Bowen,* that the touchstone of non-warrant searches under the Fourth Amendment is reasonableness. In *Bowen,* the Court acknowledged the fact that not every car passing the checkpoint was stopped and not every car stopped was searched. Thus, room for discretionary whim still existed. But the *Bowen* court then reasoned further that, this point aside, it found nothing in the *Almeida-Sanchez* decision which would limit its application to only roving patrols:

"Nonetheless, even conceding that a fixed-checkpoint search might be less of an imposition on domestic travelers than a roving-patrol search, we are able to find nothing in the opinion of the Court in *Almeida-Sanchez* which suspends Fourth Amendment standards in dealing with immigration

searches at fixed checkpoints." Page 964.)

As this Court has stated above, it is the whimsical nature of the search in *Almeida-Sanchez* that made it unreasonable. This Court is aware of certain "wave by" techniques that are used at some checkpoints, but it is the evidence before this Court that the checkpoint in question had the policy of questioning all who passed by. A checkpoint where everyone is stopped removes the arbitrariness of the search and in the mind of this Court renders *Almeida-Sanchez* inapplicable. Consequently, this Court must respectfully disagree with the Ninth Circuit and hold that *Almeida-Sanchez* does not govern the factual setting of the case before it. It is interesting to note that out of the thirteen judges who participated in the *Bowen* decision, only Chief Judge Richard H. Chambers and Judge Wallace live on or near the Mexican border and both of them dissented in the *Bowen* opinion.

■ Since the checkpoint in the case at bar was the functional equivalent of the border, the initial search was legal. Consequently, the second search was also legal, as it was accompanied by probable cause gained in the first search and exigent circumstances. Agent Kieffe testified that the car was riding low in the back—an impression that is confirmed by the sheer bulk of the discovered contraband, 660 pounds—and that while inspecting the occupants and the vehicle, he smelled the scent of marihuana. This olfactory impression was gained while he was standing in a place where he had a right to be and was inadvertent on his part. As such, it comes under the plain view doctrine which applies to all sensory impressions gained by an officer who is legally present in the position from which he gains them. United States v. Leazar, 460 F.2d 982 (CA 9 1972); United States v. Perry, 339 F.Supp. 209 (D.C.Cal.1972). This smelling of marihuana did not constitute a search, Walker v. Beto, 437 F.2d 1018 (CA 5 1971), but, when combined with the fact that it emanated from a low-riding automobile, gave Agent Kieffe probable cause to search the entire car. I need only add that the search was attended by exigent circumstances in that a moving automobile was being searched on the open road. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543 (1925).

In conclusion, the initial stop and inspection was legal, because it was carried out at the functional equivalent of the border and it was reasonable to stop all who passed that point for an inspection. The second search, which revealed 660 pounds of marihuana, was a legal consequence of the first search and was itself legal, based as it was on probable cause and exigent circumstances. The only way that the searches in question could be invalidated would be for this Court to hold 8 U.S.C. § 1357 unconstitutional—the statute authorizing Border Patrol agents to make the initial stop—a step this Court declines to take.

On May 31, 1974, the Defendant appeared with counsel and in open court announced that he wished to waive a jury and submit his case to the Court on the testimony adduced at the hearing, along with the stipulation that the seizure weighed 660 pounds and contained marihuana. The evidence on the question of innocence or guilt is quite simple. While making a traffic checkpoint inspection, Border Patrolman Kieffe noticed the smell of marijuana about the Defendant's heavily loaded car. On opening the trunk of the car, Officer Kieffe found 660 pounds of marihuana, an amount sufficient for this Court to presume commercial intent. This Court is convinced beyond a reasonable doubt that the Defendant knowingly possessed 660 pounds of a substance that he knew to be marihuana and, therefore, finds him guilty as charged of possessing 660 pounds of marihuana, with intent to distribute, in violation of 21 U. S.C. 841(a)(1).

The Defendant, Rodolfo Trinidad Fuentes, will present himself to the Court on Monday, July 8, 1974, at 9:30 a.m. for sentencing.

APPENDIX

PLEASE REFER TO THIS FILE NUMBER

**UNITED STATES DEPARTMENT OF JUSTICE**

**IMMIGRATION AND NATURALIZATION SERVICE**
**U. S. BORDER PATROL**
**P. O. BOX 1178**
**MCALLEN, TEXAS**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
**78501**

MCA 40/11-C

**FILED**

JUN 5 1974

V. BAILEY THOMAS, CLERK
BY DEPUTY: *[signature]*

May 31, 1974

Mr. John P. Smith
Asst. U. S. Attorney
Southern District of Texas
P. O. Box 1671
Brownsville, Texas 78520

Dear Mr. Smith:

In accordance with your request I am enclosing an affidavit which I hope meets your need.

I have also included a voided copy of Form I-186 and copies of Forms G-23.17 for Fiscal Year 1973, showing apprehension statistics for the three Border Patrol Stations. This material has been included for whatever relevancy it may have to the matter.

Sincerely,

*[signature]*
Leo E. Dunnigan, Acting
Chief Patrol Agent

LED:ccc
Encls.

## A F F I D A V I T

LEO E. DUNNIGAN, Acting Chief Patrol Agent of the McAllen, Texas

Sector, U. S. Border Patrol, being duly sworn deposes and says:

Non-immigrant Mexican aliens who have been issued Form I-186,
Non-Resident Alien Mexican Border Crossing Card, may be admitted
to the United States without other documentation. When used as
the sole entry document the Form I-186 is valid only for visits to
the United States within 25 miles of the Mexican border for a period
of seventy-two (72) hours or less.

The following statistics, from official records, reflect the
number of alien visitors with Forms I-186 who were apprehended at
Border Patrol traffic checkpoints near Falfurrias, Kingsville and
Rio Grande City, Texas during Fiscal Year 1973. These aliens were
destined to the interior of the United States without the proper
additional documentation as required:

|  |  |
|---|---|
| Falfurrias | 244 |
| Kingsville | 231 |
| Rio Grande City | 116 |

Leo E. Dunnigan

SUBSCRIBED AND SWORN TO, before me, this 31st day of May, 1974.

Notary Public in and for Hidalgo County, Texas

DOLORES SANCHEZ
Notary Public In and For
Hidalgo Couny, Texas

UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

## DEPORTABLE ALIENS LOCATED BY BORDER PATROL

Month: _____   FY-73
Reporting office: RIO GRANDE CITY STATION

IV. BORDER PATROL (Contd.)

| Operation | TOTAL (Columns 2-12) | 2 Agricultural worker | 3 Visitor | 4 Student | Crewman 5 Non-willful violator D-1 | 6 Willful violator D-1 | 7 Non-willful violator D-2 | 8 Willful violator D-2 | 9 Immigrant | 10 Stowaway | 11 E.W.I. | 12 Other | 8 U.S.C. 1324,1327,1328 Aliens 13 At entry | Length of time illegally in U.S. 14 Within 72 hours | 15 4-30 days | 16 Over 30 days | 17 Principals | 18 By aircraft | 19 By watercraft | 20 By other means | Fraudulent claim to USC 21 Presented documents | 22 Unsupported oral claims | Fraudulent claim to legal status 23 Alien Registration Receipt Card (I-151) | 24 Non-resident Alien Mexican Border Crossing Card (I-186) | 25 Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. TOTAL (Lines 2-10) | 1704 | | 215 | | | 1 | | | 6 | | 1440 | 42 | 825 | 462 | 123 | 30 | 82 | | | 302 | 39 | 6 | 6 | 6 | 6 |
| 2. Line watch | 896 | | 27 | | | | | | 1 | | 864 | 4 | 768 | 60 | 29 | 7 | 11 | | | 52 | 6 | 1 | 1 | | |
| 3. Patrol | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4. Farm-ranch check | 241 | | 22 | | | | | | | | 217 | 2 | 2 | 123 | 76 | 16 | 1 | | | 2 | 2 | | | 2 | 2 |
| 5. Traffic check | 444 | | 116 | | | | 1 | | 5 | | 288 | 39 | 54 | 227 | 5 | 2 | 70 | | | 242 | 31 | 5 | 5 | 4 | 4 |
| 6. Transportation check - Total | | | | | | | | | | | | | | | | | | | | | | | | | |
| (a) Bus | | | | | | | | | | | | | | | | | | | | | | | | | |
| (b) Passenger train | | | | | | | | | | | | | | | | | | | | | | | | | |
| (c) Freight train | | | | | | | | | | | | | | | | | | | | | | | | | |
| (d) Aircraft | | | | | | | | | | | | | | | | | | | | | | | | | |
| 7. City patrol | 92 | | 44 | | | | | | | | 46 | 2 | 1 | 35 | 7 | 3 | | | | | | | | | |
| 8. Boat patrol | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9. Crewman-stowaway | 31 | | 4 | | | | | | | | 25 | | | 17 | 6 | 2 | | | | | | | | | |
| 10. Turned over to BP by other agencies | | | | | | | | | | | | 1 | | | | | | | | | | | | | |
| 11. *Observation aircraft | 453 | | | | | | | | | | 449 | | | | | | | | | | | | | | |
| 12. *Electric eyes | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13. *Ultraviolet light | 1 | | | | | | | | | | | | | | | | | | | | | | | | |
| 14. *Other elec./mech. devices | 16 | | | | | | | | | | 16 | 1 | | | | | | | | | | | | | |

* Included in appropriate activity, lines 2 through 10.

CREWMAN - Exclude crewmen on 29-day vessels.

E.W.I. - Place of entry - Station area

| TOTAL | CHU | ECL | CAO | ELC | CAX | YUM | TNA | GEN | CAG | TCA | NGL | DCL | LOB | CLM | EPT | FEN | FHT | SBT | VHT | MAR | PRS | APT | SNN | COM | DRT | EGT | CAR | LRT | HEB | RGC | MCA | MER | HRL | ERP | BLW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1440 | | | | | | | | | | | 1 | | | | 2 | | | | | | | | | | | | 1 | 24 | | 1156 | 198 | 42 | | 36 | |

| IND | FORB | COV | BOW | WRF | BRN | SWG | HVM | MLT | WOL | PRT | BOT | PMB | WRM | INF | GMM | SMM | PHM | DTM | TRE | BUN | NIB | WAT | OGN | MNB | MLB | ROB | SWB | RIB | DBV | BVB | IMB | VMB | PFM | HHF | LMB | CMB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

(See instructions on reverse side.)

Form G-23.17   (Rev. 3-1-73)N

UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

IV. BORDER PATROL (Contd.)

DEPORTABLE ALIENS LOCATED BY BORDER PATROL

Month: FY-73
Reporting office: F. FURRIAS STATION

| Operation | 1 TOTAL (Columns 2-12) | 2 Agricultural worker | 3 Visitor | 4 Student | 5 Crewman D-1 Non-willful violator | 6 Crewman D-1 Willful violator | 7 Crewman D-2 Non-willful violator | 8 Crewman D-2 Willful violator | 9 Immigrant | 10 Stowaway | 11 E.W.I. | 12 Other | 13 At entry | 14 Within 72 hours | 15 4-30 days | 16 Over 30 days | 17 Principals | 18 By aircraft | 19 By watercraft | 20 By other means | 21 Presented documents | 22 Unsupported oral claims | 23 Alien Registration Receipt Card (I-151) | 24 Non-resident Alien Mexican Border, Crossing Card (I-186) | 25 Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. TOTAL (Lines 2-10) | 2727 | | 311 | | | | | | 51 | | 2124 | 241 | | 1172 | 687 | 265 | 61 | | | 202 | 256 | 13 | 55 | | 12 |
| 2. Line watch | 302 | | 3 | | | | | | | | 299 | | | 159 | 135 | 5 | 4 | | | 3 | 1 | | | | |
| 3. Patrol | 300 | | 3 | | | | | | | | 297 | | | 63 | 169 | 65 | | | | | | | | | |
| 4. Farm-ranch check | 1220 | | 244 | | | | | | 40 | | 716 | 220 | | 538 | 163 | 15 | 55 | | | 155 | 234 | 12 | 44 | | 12 |
| 5. Traffic check | 537 | | 42 | | | | | | 11 | | 470 | 14 | | 262 | 82 | 126 | | | | | 18 | 1 | 11 | | |
| 6. Transportation check - Total | 282 | | 40 | | | | | | 10 | | 218 | 14 | | 42 | 61 | 115 | | | | | 18 | 1 | 10 | | |
| (a) Bus | 255 | | 2 | | | | | | 1 | | 254 | | | 220 | 21 | 11 | 2 | | | | | | 1 | | |
| (b) Passenger train | | | | | | | | | | | | | | | | | | | | | | | | | |
| (c) Freight train | 32 | | 6 | | | | | | | | 23 | 3 | | 8 | 12 | 3 | | | | 15 | 3 | | | | |
| (d) Aircraft | | | | | | | | | | | | | | | | | | | | | | | | | |
| 7. City patrol | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8. Boat patrol | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9. Crewman-stowaway | | | | | | | | | | | | | | | | | | | | | | | | | |
| 10. Turned over to BP by other agencies | 336 | | 13 | | | | | | | | 319 | 4 | | 142 | 126 | 51 | | | | | 1 | | | | |
| 11. *Observation-aircraft | 113 | | | | | | | | | | 113 | | | | | | | | | | | | | | |
| 12. *Electric eyes | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13. *Ultraviolet light | 18 | | | | | | | | | | | 18 | | | | | | | | | | | | | |
| 14. *Other elec./mech. devices | 37 | | | | | | | | | | | 37 | | | | | | | | | | | | | |

* Included in appropriate activity, lines 2 through 10.

CREWMAN - Exclude crewmen on 29-day vessels.

E.W.I. - Place of entry - Station area

| | CHU | ECJ | CAO | ELC | CAX | YUM | TNA | GBN | CAG | TCA | NGL | DGL | LOB | CLM | EPT | FEN | FRN | SBT | FHT | VHT | MAR | PRS | APT | SNN | COM | DRT | EGT | CAR | LRT | HEB | RGC | MCA | MER | HRL | BRP | BLW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL 2124 | | | | | | | | | | | | | | 7 | | | | | | | | 2 | | | | 44 | 40 | 488 | | | 110 | 1125 | 155 | | 153 | |

| IND | ORB | COV | WHF | BRN | SWG | HVM | MLT | WOL | PRT | BOT | FMB | WRM | INF | GMM | SMM | PHM | DTM | TRE | BUN | NIB | WAT | OGN | MNB | MLB | ROB | SWB | RIB | DBV | EVB | JMB | VAB | FFM | HLT | LMB | CMB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

(See instructions on reverse side.)

Form G-23.17  (Rev. 3-1-73)N

UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service

DEPORTABLE ALIENS LOCATED BY BORDER PATROL

Month: **FY-73**
Reporting office: **KINGSVILLE STATION**

## IV. BORDER PATROL (Contd.)

| Operation | 1 TOTAL (Columns) | 2 Agricultural worker | 3 Visitor | 4 Student | 5 Non-willful violator (D-1) | 6 Willful violator (D-1) | 7 Non-willful violator (D-2) | 8 Willful violator (D-2) | 9 Immigrant | 10 Stowaway | 11 E.W.I. | 12 Other | 13 At entry | 14 Within 72 hours | 15 4-30 days | 16 Over 30 days | 17 Principals | 18 By aircraft | 19 By watercraft | 20 By other means | 21 Presented documents | 22 Unsupported oral claims | 23 Alien Registration Receipt Card (I-151) | 24 Non-resident Alien Mexican Border Crossing Card (I-186) | 25 Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. TOTAL (lines 2-10) | 2622 | | 247 | 2 | | 1 | | | 62 | | 1949 | 361 | | 1257 | 616 | 76 | 69 | | | 274 | 357 | 52 | 67 | 6 | |
| 2. Line watch | 348 | | 14 | | | | | | | | 834 | | | 507 | 323 | 4 | 5 | | | 39 | | | | | |
| 3. Patrol | 156 | | | | 1 | | | | | | 156 | | | 0 | 118 | 37 | | | | 3 | | | | | |
| 4. Farm-ranch check | 134 | | 231 | 2 | | 1 | | | 61 | | 249 | 355 | | 600 | 118 | 31 | 63 | | | 233 | 350 | 52 | 60 | 6 | |
| 5. Traffic check | 181 | | | | | | | | | | 181 | | | 130 | 50 | 1 | | | | | | | | | |
| 6. Transportation check - Total | 3 | | | | | | | | | | 3 | | | 3 | | | | | | | | | | | |
| (a) Bus | | | | | | | | | | | | | | | | | | | | | | | | | |
| (b) Passenger train | | | | | | | | | | | | | | | | | | | | | | | | | |
| (c) Freight train | 178 | | | | | | | | | | 178 | | | 187 | 50 | | | | | | 1 | | 1 | | |
| (d) Aircraft | | | | | | | | | | | | | | | | | | | | | | | | | |
| 7. City patrol | 18 | | 1 | | | | | | 1 | | 10 | 6 | | 1 | 6 | 3 | | | | | | | | | |
| 8. Boat patrol | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9. Crewman-stowaway | 20 | | 1 | | | | | | | | 19 | | | 9 | 7 | 3 | | | | | | | | | |
| 10. Turned over to BP by other agencies | 424 | | | | | | | | | | 424 | | | | | | | | | | | | | | |
| 11. *Observation aircraft | 424 | | | | | | | | | | | | | | | | | | | | | | | | |
| 12. *Electric eyes | | | | | | | | | | | | | | | | | | | | | | | | | |
| 13. *Ultraviolet light | | | | | | | | | | | | | | | | | | | | | | | | | |
| 14. *Other elec./mech. devices | 399 | | | | | | | | | | 399 | | | | | | | | | | | | | | |

* Included in appropriate activity, lines 2 through 10.

CREWMAN - Exclude crewmen on 29-day vessels.

### E. W. I. - Place of entry - Station area

| DRT | EGT | CAR | LRT | HEB | RGC | MCA | MER | HRL | BRP |
|---|---|---|---|---|---|---|---|---|---|
| 6 | 1 | | 15 | | 15 | 477 | 159 | 20 | 257 |

*/ Stations not included by service location code.

| TOTAL | CHU | ECJ | CAO | ELC | CAX | YUM | TNA | GBN | CAG | TCA | NGL | DGL | LOB | DNM | YST | EPT | FBN | FHT | SBT | VHT | MAR | TRE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1949 | | | | | | | | | | | 1 | | | | | | | | | | | |

| BLM | LND | ORV | COV | BON | WHF | YUM | TNA | BRN | SHL | MLB | ROB | SWB | RIB | DBV | MLT | WOL | PRT | BOT | PMB | WRM | INF | GHM | SMM | FBN | FHT | PHM | DTM | DTM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| BUN | NIB | WAT | OGN | MNB | MNB | MLB | ROB | SWB | RIB | DBV | JMB | BVB | VMB | FFM | HLT | LMB | CMB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

G-23.17     (Rev. 3-1-74)N

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
P.O. BOX 2539
U.S. POST OFFICE & COURTHOUSE
SAN ANTONIO, TEXAS 78206

June 7, 1974

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

FILED

JUN 1 1 1974

V. BAILEY THOMAS, CLERK
BY DEPUTY

TO WHOM IT MAY CONCERN:

According to statistical information of this Service, the following
nonimmigrant aliens entered at land border ports of entry from
Brownsville through Falcon during F.Y. 1973 (July 1, 1972 through
June 30, 1973):

|  |  |  |
|---|---|---|
| Brownsville | - | 9,016,853 |
| Progreso | - | 866,024 |
| Hidalgo | - | 6,800,139 |
| Los Ebanos | - | 55,162 |
| Rio Grande City | - | 479,760 |
| Roma | - | 1,687,013 |
| Falcon | - | 118,957 |
| Total |  | 19,023,908 |

Of these nonimmigrant aliens, over 91% entered by presentation of
nonresident alien border crossing cards and were admitted without
further documentation for visits within 25 miles of the international
boundary for periods not to exceed 72 hours.

Signature: _____
Joe F. Staley
District Director

Subscribed and sworn to before me at _____San Antonio,_____

_____Texas_____ on _June 10, 1974_

_Laura Thomas_
Notary Public