UNITED STATES of America

v.

John David WILSON.

Crim. No. 75–L–44.

United States District Court,
S. D. Texas,
Laredo Division.

Jan. 14, 1976.

224

Joseph G. Garza, Laredo, Tex., for plaintiff.

George W. Shaffer, Corpus Christi, Tex., for defendant.

## MEMORANDUM AND ORDER

O'CONOR, District Judge.

The defendant John David Wilson is charged with unlawful possession of a controlled substance (493 pounds of marihuana) with the intent to distribute it, a violation of Title 21, U.S.C. § 841(a)(1) (1970), and with the unlawful carrying of a firearm during the commission of a felony, a violation of Title 18, U.S.C. § 924(c)(2)(1971). The defendant contends that the search of his vehicle was a continuing search originating at a roadside park and culminating at a border patrol checkpoint. He further contends that the search which revealed the presence of marihuana in the defendant's camper truck was unconstitutional under the Fourth Amendment and that the evidence thereby obtained should be suppressed. Defendant contends that this was not a border search reasonable under the Fourth Amendment. The government contends that the search was a functional equivalent to a border search and thus constitutional.

## DISCUSSION OF THE FACTS

This case was tried with a stipulation as to the chain of custody and as to the substance being marihuana. The defendant filed a motion to suppress the evidence and any written or oral statements made by him at the time of or after his arrest.

On February 5, 1975, two border patrol agents were travelling south on Highway 649. Having gone off duty at 4:00 p. m., they were proceeding toward Rio Grande City with a load of illegal aliens whom they were returning to Mexico. At the intersection of Highway 649 with Highway 2687, they noticed a 1974 Ford pickup truck parked at a small roadside area. This area has a litter barrel but is not furnished with tables or benches. As they approached they noticed that a person was standing beside the truck. The agents stopped at the roadside area. They noticed that there was affixed to the back of the truck a camper attachment. The camper had windows "all the way around" which were not covered with curtains. The vehicle was parked so that a driver would be facing north.

Having stopped, the agents walked to the truck. One of the agents asked the defendant, who was standing beside the truck, if he was an American citizen, to which he replied in the affirmative. The defendant then told the agents that his truck's engine was overheated, and the agents asked him to open the hood. When he had opened it, the agents examined the condition of the engine and found no indications of overheating. There was no fizzling from the area around the radiator, and the removal of the radiator cap revealed no signs of an excessively heated coolant. One of the agents asked the defendant how long he had been parked there, and the defendant stated that he had been there 30 or 40 minutes.

The agents then walked around to the back of the truck and asked the defendant to open the camper. The defendant having complied, one agent climbed into the back of the camper and looked around. This

agent testified that there was a strong odor of gasoline in the camper. Inside the camper was a "raised area", described also as a platform, and a bedroll. Having made this cursory examination, the agent stepped down on the pavement. The defendant appeared to be very tense throughout this encounter.

The defendant testified that one of the border patrol agents then told him to move on down the road. Border patrol agent McCord, however, testified that he had not instructed the defendant to leave the park nor had he instructed him to travel through the checkpoint.

Agent Michael McCord testified that this incident occurred at about 4:15 or 4:20, and that it would not have been possible for the defendant to have made a left turn on another highway and to have returned to Highway 649 in order to have arrived at the checkpoint at the time at which he did.

At the border patrol checkpoint, the border patrol agents were in their car near the stop sign. According to the defendant, shortly after his arrival he heard a question transmitted on the radio in the agent's car, "Is he there yet?" One of the officers replied, "Yes, he's here." Through a window in the camper Agent Jerry Harville could see the plywood-covered part of the area within the camper. He asked the driver to open the camper's back door. When it was opened, Agent Jerry Harville immediately observed a box in the back of the camper on the right side. The aroma of marihuana was quite obvious. The box was near the agent as he stood directly behind the truck, and through an opening in this box bricks of marihuana could be seen. One of the bricks had been torn open so that the marihuana inside was visible. Boxes containing marihuana bricks were under the plywood covering, and with the back door of the camper open, they could be seen from outside the camper. But with this back door closed, they could not be seen from the outside. Having probed further into this area, Agent Harville found 493 pounds of marihuana concealed in these boxes. The agents placed the defendant

under arrest and read a *Miranda* warning from a card.

In this search, the agents found a number of items in the truck; some mattresses, and bedrolls, a loaded gun, a cigarette loading machine, a pair of binoculars, and a radio scanner, which could be used to detect transmissions from radios in the vicinity through constant scanning of the radio spectrum. Agent Harville turned these items over to Drug Enforcement Agent Lund, from whom the chain of custody was stipulated.

Agent Harville stated that the checkpoint had operated continuously from the midnight of February the 4th and 5th to the midnight of the 11th and 12th of February. During this period of seven days the checkpoint was operated twenty-four hours a day. This checkpoint has always been established in Randado; however, because of a lack of manpower and inclement weather, the checkpoint is not always operational. The equipment is not stored at the checkpoint. This equipment includes portable signs and lights. When the checkpoint is operational, all traffic is stopped. However, after it is dismantled, there is no way to detect the passage of cars and other vehicles.

## DISCUSSION OF THE LAW

The concept of functional equivalency to the border was first discussed in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). There the Court said:

Whatever the permissible scope of intrusiveness of a routine border search might be, searches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well. For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches.

Later in *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the Supreme Court held that searches at traffic

checkpoints removed from the border and its functional equivalents may be conducted only where consent or probable cause is shown.

The Court for the Brownsville Division has held that the checkpoint at La Gloria was the functional equivalent of the border because of its geographical location in relationship to the border and the roads leading therefrom as well as because of the variety of evasive techniques used by aliens wishing illegally to penetrate the interior of the country. *United States v. Fuentes,* D.C. Tex., 379 F.Supp. 1145, aff'd, 517 F.2d 1401 (5th Cir. 1975). In that case the Court pointed out that Mexican nationals may obtain I–186 cards, which evidence the holder's privilege of entering the United States for a period of seventy-two hours, provided that the holder remains within twenty-five miles of the border. It was noted that at the La Gloria checkpoint and other checkpoints similarly situated Mexican nationals, while they may be holders of I–186 cards, must furnish additional documentation in order to proceed further north. Those who have crossed the river illegally, by swimming or other means, and have found means of transportation on this side, are subjected to the scrutiny of Immigration and Naturalization Service for the first time at such checkpoints. For these illegal aliens, the Court said that such checkpoints were a "second river". The Court further stated that the checkpoint was strategically located, that every car coming through the checkpoint had been stopped, and that the checkpoint was a permanent one.

The checkpoint in the instant case is near the intersection of Highway 649 and Highway 16 about one mile east of Randado. These highways are but two of the many intersecting thoroughfares which form a network between Highway 281, from McAllen through Falfurrias on the eastern side, and Interstate 35, from Laredo through Cotulla on the west. The network of arteries between these two major highways comprises lesser highways, farm-to-market roads, and county roads which criss-cross the wide expanse of the area. The southern boundary of this area is formed by Highway 83 into which many of the roads in the area connect. There are but a few cities in the area and only several small towns. Between these settlements, there are few habitations or people. The roads in the area are lightly travelled. There stands no chain-link or barbed-wire fence to block access from the river. There is no wall. There are no guards on sentry duty, nor are there watchtowers along this frontier. There are dozens of intervals of several miles each where there are no dwellings and no people, and where indeed there is hardly a sign of civilization, other than the vacant road. Depending on the season, the previous rainfall, and the exact location, there are many places where the nonswimmer can wade across. Where the river is deeper, swimmers who were not particularly skilled can still cross with little trouble. In places where it is still deeper or wider, small vessels can cross undetected in the quiet of the night or the isolation of the day. Except where there are small towns, these geographic conditions exist throughout the one-hundred mile long border area from Laredo to Rio Grande City, which lies to the west, southwest, and south of the checkpoint in Randado.

No one can predict within any degree of certainty the precise points along the river border where aliens and smugglers may choose to cross. The river lies between two major highways, one on the Mexican side and another on the American side. For more than two hundred miles, these highways run in close proximity to the river and certainly within walking distance for those determined to cross. The presence of these two highways parallel to the river tends to facilitate aliens and smugglers by affording them a wide range of choices in determining where to cross. When they have reached the highway on the American side, they can make contact with those whose business it is to facilitate this illegal traffic. At this point they have eluded the duly-constituted authorities whose lawful function it is to supervise entry into the United States. And, given the special geographic circumstances of the area, it is simply not

possible by any practical means to prevent their undetected entry.

The highway on the American side, U.S. Highway 83, connects with the network of roads in this area as described earlier. Every day, a number of aliens are found travelling on these roads as they make their way toward the north. As to this group of aliens whose entry was illegal from the beginning, checkpoints strategically located within this system of roads serve the same function as the stations at the international bridges along the Rio Grande.

In this same area may be found the holders of I–186 cards. Unlike those who wade or swim across the river their entrance into United States was lawful. However, their movement beyond the zone lying twenty-five miles north of the river is not lawful, and, every day, a number of card-holders are found travelling north of the permitted zone. With respect to this second group of aliens, checkpoints strategically located beyond the twenty-five mile limit similarly serve the same function as the stations located at the international bridges.

 Whether the checkpoint at Randado is the functional equivalent of the border must be determined from the geographical characteristics and the related problems of protecting the integrity of the international boundary. The ineffectiveness of the Rio Grande River as a barrier to entry, together with the geography and the presence of a large group of legal aliens, leads this Court to conclude that the checkpoint at Randado is the functional equivalent of the border.

This Court would like to point out that this checkpoint is strategically located as to the confluence of roads from the border or border areas. It is outside the twenty-five mile limit beyond which the holders of non-resident alien border crossing cards (I–186 cards) are not permitted to travel. The establishment of a checkpoint within twenty-five miles of the border would do nothing to prevent this illegal traffic. Beyond that twenty-five limit, further into the interior, checkpoints established just beyond the confluence of two or more roads will not only result in more efficient, economical operation, but also reduce the interference with domestic traffic to a minimum. If, however, a checkpoint were to be located at a point on Highway 83, it would disrupt the heavier volume of traffic between Laredo and the Rio Grande Valley, and at the same time would be totally ineffective in light of the area conditions.

Furthermore, the interference with domestic traffic resulting from the establishment of the checkpoint at Randado must be considered slight. None of the roads which converge near Randado connect large cities. Traffic from Zapata (population 2,102, 1970 census) to Hebbronville (population 4,079, 1970 census), or vice versa, would ordinarily use Highway 16. Other area cities include Rio Grande City (population 5,676, 1970 census) and Roma-Los Saenz (population 2,154, 1970 census). To this must be added the small towns of Bustamante, Petroleum, Thompsonville, Guerra, Cuevitas, Victoria, San Ygnacio, and Falcon Heights and the surrounding ranches. Travel from more populous areas does not ordinarily flow through this area. Considering the sparcity of the population, the establishment of this checkpoint does not too greatly interfere with domestic traffic.

II

 Since the search at the Randado checkpoint was at the functional equivalent of the border, the officers could legally search for aliens. See *United States v. Fuentes,* 379 F.Supp. 1145 (S.D.Tex.1974), aff'd, 517 F.2d 1401 (5th Cir. 1975). The camper part of the truck was an area of that vehicle where it was reasonable to believe that aliens could be hidden, and the testimony indicates that the area covered by the plywood was large enough to contain five grown men. Therefore, the scope of the search was reasonable as a search for aliens at the functional equivalent of the border.

 When the back door of the camper had been opened, the officer detected the odor of marihuana and saw a pasteboard box, through an opening in which he could

see a brick which was torn open. The marihuana contained in the brick was visible to the officer. These visual and olfactory impressions were gained while the officer was standing where he had a right to be and was inadvertent on his part. See *Fuentes, supra; Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The sensory impressions were in the plain view of an officer who was legally present in the position from which he gained them. These impressions gave the officer probable cause to believe that crimes had been or were being committed, and such further uncovering of materials or opening of contained areas as might constitute a search or searches were accompanied by probable cause. Since a moving automobile was to be searched on the open road, the search was attended by exigent circumstances. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

The agents at the Randado checkpoint had reasonable grounds to believe that the defendant was involved in illegal activity in the nature of an immigration or customs violation. It is well known that smugglers of aliens and contraband use roads in this area, and they are often found in camper-trucks. More importantly the officers at the roadside park had seen a handgun in plain view, and it is well known that persons involved in smuggling often carry such weapons.

In conclusion, the stop of the vehicle at the Randado checkpoint was lawful, and the scope of the search in the camper was reasonable as a search for aliens. During the course of this search for aliens, the agent saw marihuana in plain view and detected its odor, and any further search or searches were based on probable cause.

It should be noted that the Supreme Court of the United States has recently decided three important cases relating to border searches. *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Bowen v. United States,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

In *Ortiz,* the Court held that border patrol officers, in the absence of consent and probable cause, had no authority valid under the Fourth Amendment to search private vehicles at traffic checkpoints removed from the border and its functional equivalents, and that the differences between traffic checkpoints and roving patrols, while relevant to the constitutional issues, do not justify courts in dispensing with the safeguards required in *Almeida-Sanchez.* However, as the Court, noted, the Government did not contend that the checkpoint involved in that case was at the functional equivalent of the border, and the only issue was whether vehicle searches at other traffic checkpoints, like the roving patrol search in *Almeida-Sanchez,* must be based on probable cause. Therefore, neither *Ortiz* nor the other decisions then handed down is dispositive of the issues in this case, since the search in this case was conducted at the functional equivalent of the border.

### III

The defendant, however, contends, "If the search at the checkpoint on Texas Highway 16 is to be considered a separate and independent search, the evidence on the preceding search dissipates the nexus between this defendant and the border, there being no further evidence of a border crossing or direct contact with the boundary in any way after the first search." The defendant relies primarily on *United States v. Bursey,* 491 F.2d 531 (5th Cir. 1974) and *United States v. Newell,* 506 F.2d 401 (5th Cir. 1975), *reh. den.,* 510 F.2d 384 (5th Cir. 1975).

The defendant contends that the facts in this case are similar to those in *Bursey.* In that case, acting on information supplied by an informant, customs agents conducted four separate searches related to the defendants in the case: first, a search at the Port of Entry at Roma, Texas, where the defendants crossed in a green Chevrolet; second, a thorough but unsuccessful search of this same car as the defendants were en route from Roma, Texas, to McAllen, Texas, on the following day; third, a search of

a Dodge in which two of the defendants were then riding, conducted four days following the first search, at a mobile border patrol checkpoint near Sarita, Texas, approximately eighty miles north of McAllen, in which search the peyote was uncovered; and fourth, a search of an Oldsmobile in which a co-defendant was travelling near Refugio, Texas, which revealed another cache of peyote. The Court held that the evidence discovered in both the third and fourth searches was inadmissible, because the first and second searches had "dissipated the nexus between these appellants and the border", where there was no further evidence of an additional border crossing or direct contact with the border in any way, and because the evidence revealed no connection between the Oldsmobile searched and the international boundary.

However, other cases make it exceedingly clear that one border search does not necessarily destroy the validity of all subsequent searches. In *United States v. Bowman,* 502 F.2d 1215 (5th Cir. 1974) the Court upheld a second search by customs agents made pursuant to the suspicion of a customs inspector where a first search of the vehicle had been made at the secondary inspection station at the international bridge in Laredo. The Court distinguished this case from *Bursey,* stating:

> The suspicion of a Mexican transaction or contact was still fresh at the time of the search. It had been attenuated by neither time nor distance. * * * Nor had any new information intervened to vitiate the initial suspicion. In these circumstances, we find the search was reasonable.

The Court held that the second search in *Bowman* was a valid border search.

It appears to this Court that, to the extent the instant search is similar to the one in either of these cases, it is more similar to the search in *Bowman.* In the instant case,

the search which revealed the evidence was conducted within minutes of the initial intrusion, and within a distance of only a few miles. In *Bursey,* the Court noted that the border crossing relied upon by the prosecution to connect the appellants with the border occurred four days prior to the challenged search, and that the search occurred almost one hundred miles from the border. In neither case, however, was it held that the subsequent search was conducted at the functional equivalent of the border.

Furthermore, the Courts in this Circuit, as well as in the Ninth, have repeatedly held that a suspect is not immune from further examination merely because he has previously passed through a customs check. *United States v. Maggard,* 451 F.2d 502 (5th Cir. 1971) cert. denied, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (1972)[1]

The issue of whether the site of a particular search was at the functional equivalent of the border, a legal concept crystalized in the *Almeida-Sanchez* decision, was neither discussed or decided in either *Bursey* or *Bowman.* The Court in *Bursey* stated that "under no circumstances" could the search be viewed as a border search, and refrained from deciding whether the rules of decision to be applied were pre-*Almeida-Sanchez* or post-*Almeida-Sanchez* law. That case involved a search at a "mobile checkpoint," and the Court never found it necessary to address the question of whether the checkpoint was at the functional equivalent of the border. *Bowman,* however, was clearly decided on the basis of pre-*Almeida-Sanchez* rules.

More importantly, both *Bowman* and *Bursey* involve what have been denominated "extended border searches", see *Bowman* and *United States v. Anderson,* 509 F.2d 724 (9th Cir. 1975). In this circuit extended border searches have been found to be reasonable under pre-*Almeida-Sanchez* law

---

1. *United States v. Warner,* 441 F.2d 821 (5th Cir. 1971) cert. den. 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *Morales v. United States,* 378 F.2d 187 (5th Cir. 1967); *Thomas v. United States,* 372 F.2d 252 (5th Cir. 1967); *United States v. Salazar-Gaeta,* 447 F.2d 468 (9th Cir.);

*United States v. Mejias,* 452 F.2d 1190 (9th Cir. 1971); *United States v. Beye,* 445 F.2d 1037 (9th Cir. 1971); *United States v. Terry,* 446 F.2d 579 (9th Cir. 1971) cert. den. 404 U.S. 946, 92 S.Ct. 301, 30 L.Ed.2d 261 (1971).

where the circumstances included "some connection or contact with the border, even though the vehicle may not have crossed the border." *Newell v. United States,* 506 F.2d 401 (5th Cir. 1975); *United States v. Steinkoenig,* 487 F.2d 225 (1973). A strong nexus with the border and the reasonable suspicion of wrongdoing distinguish the circumstances of extended border searches from the circumstances of the searches involved in *Almeida-Sanchez* and its progeny. *United States v. Steinkoenig,* 487 F.2d 225, 228 (5th Cir. 1973); *United States v. Rogers,* 504 F.2d 1079 (5th Cir. 1974). It is not necessary for this Court to say whether such searches are to be considered reasonable under the same standards which have been heretofore held applicable, see *Newell, supra,* in order for it to say that an extended border search is not involved in this case.

In the instant case, the Government does not rely on any connection or contact with the border in an attempt to qualify it as an extended border search. Indeed, since the site of the search was the functional equivalent of the border, there is no necessity for the Government to do so. Therefore, any reliance of the defendant on *Bursey* is wholly without merit.

■■ This Court does not look with favor upon repeated searches of the same person in the same vehicle. Certainly, where there is no reasonable suspicion of any illegal activity related to the subject of the search, and where an initial search reveals nothing that indicates the commission of a crime, repeated searches which might be justified in other circumstances should not be tolerated. In the instant case, having made an initial intrusion while the defendant was stopped, the agents allowed the defendant to proceed. The evidence revealed by the second search did not result from exploitation of the illegality, if any, of the first search. The second search is sufficiently distinguishable that it is purged of the taint of the first search, granting that it was illegal. See *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It appears that the search in the instant case was a constitutionally valid border search, and that the motion to suppress should be, and it is hereby, denied.

## IV

■■ Count One charges the defendant with possession of marihuana, in violation of 21 U.S.C. § 841(a)(1). This Court is persuaded from the evidence before it that the defendant knowingly possessed marihuana. The amount found in his possession, 493 pounds, is sufficient for this Court to presume an intent to distribute this marihuana. This Court finds the defendant John David Wilson guilty, as charged, of possession of a controlled substance with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).

■■ Count Two charges the defendant with unlawfully carrying a firearm during the commission of a felony. The Government failed to introduce any evidence that his carrying of the firearm was unlawful, which is an essential element of the offense. *United States v. Ramirez,* 482 F.2d 807 (2nd Cir.) cert. denied sub nom. *Gomez v. United States,* 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973); *United States v. Howard,* 504 F.2d 1281 (8th Cir. 1974); see also *United States v. Rojas,* 502 F.2d 1042 (5th Cir. 1974).

Therefore, this Court finds the defendant not guilty of the offense charged in Count Two.

The defendant shall present himself for sentencing upon notification of a date from the Clerk's office.