526 U.S. 273 (1999)
LOWE
v.
POGUE et al.
No. 98-7591.
United States Supreme Court.
Decided March 29, 1999.[*]
ON MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS
Per Curiam.
Pro se petitioner Lowe seeks leave to proceed in forma pauperis under Rule 39 of this Court. We deny this request pursuant to Rule 39.8. Lowe is allowed until April 19, 1999, within which to pay the docketing fee required by Rule 38 and to submit his petitions in compliance with this Court's Rule 33.1. We also direct the Clerk not to accept any further petitions for certiorari nor petitions for extraordinary writs from Lowe in noncriminal matters unless he pays the docketing fee required by Rule 38 and submits his petition in compliance with Rule 33.1.
Lowe has abused this Court's certiorari and extraordinary writ processes. In November of last year and earlier this month, we invoked Rule 39.8 to deny Lowe in forma pauperis status. See Lowe v. Cantrell, 525 U. S. 1176 (1999); In re Lowe, 525 U. S. 960 (1998) (three cases). Before these 4 denials, Lowe had filed 23 petitions, all of which were both patently frivolous and had been denied without recorded *274 dissent. The 4 instant petitions for certiorari thus bring Lowe's total number of frivolous filings to 31. He has several additional filingsall of them patently frivolous currently pending before this Court.
We enter the order barring prospective filings for the reasons discussed in Martin v. District of Columbia Court of Appeals, 506 U. S. 1 (1992) (per curiam). Lowe's abuse of the writ of certiorari and of the extraordinary writs has been in noncriminal cases, and so we limit our sanction accordingly. The order therefore will not prevent Lowe from petitioning to challenge criminal sanctions which might be imposed on him. The order, however, will allow this Court to devote its limited resources to the claims of petitioners who have not abused our process.
It is so ordered. 
Justice Stevens, dissenting.
For reasons previously stated, see Martin v. District of Columbia Court of Appeals, 506 U. S. 1, 4 (1992) (Stevens, J., dissenting), and cases cited, I respectfully dissent.
NOTES
[] David M. Porter and Edward M. Chikofsky filed a brief for the National Association of Criminal Defense Lawyers as amicus curiae urging reversal.
[] Congress amended the statute in 1994 and 1996. In the Violent Crime Control and Law Enforcement Act of 1994, it deleted the phrase in the first paragraph concerning firearm possession and replaced it with the phrase, "with the intent to cause death or serious bodily harm." § 60003(a)(14), 108 Stat. 1970. It also made death a possible punishment for offenses committed under subsection (3). Ibid. In the Carjacking Correction Act of 1996, Congress specified that the term "serious bodily injury" in subsection (2) includes certain sexual assaults. § 2, 110 Stat. 3020.
[] The Ninth Circuit vacated another portion of the District Court's sentencing decision and remanded. United States v. Oliver, 60 F.3d 547, 555-556 (1995). On remand, the District Court reduced petitioner's carjacking sentence to 20 years and his totalsentence to 25 years,and the Court of Appeals affirmed. App. 41-43; judgt. order reported at 116 F. 3d 1487 (1997).
[] Seen. 4,infra. 
[] Legislative history identifies three such models. See H. R. Rep. No. 102-851, pt. 1,p. 17 (1992) ("The definition of the offense tracks the language used in other federal robbery statutes (18 U. S. C. §§ 2111, 2113, 2118)"). One of them, 18 U. S. C. § 2111 (robbery in areas of federal maritime or territorial jurisdiction), lacks aggravated forms of the offense altogether, and thus is not on point here.
[] The dissent,in passing, questions our view that § 2118(a) makes the causing of significant bodily injury an element of the offense defined by that section, see post, at 261-262, but it offersno reason to doubt our reading. Given that § 2118(a) establishes only one maximum punishment, and that it makes eligibility for such punishment contingent on the establishment of at least one of three facts, one of which is the causing of death or significant bodily injury, we think our reading is the only sensible one.
[] The dissent repeatedly chides us for failing to state precisely enough the principle animating our view that the carjacking statute, as construed by the Government, may violate the Constitution. See post, at 254, 266, 277. The preceding paragraph in the text expresses that principle plainly enough, and we restate it here: under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Because our prior cases suggest rather than establish this principle, our concern about the Government's reading of the statute rises only to the level of doubt, not certainty.

Contrary to the dissent's suggestion, the constitutional proposition that drives our concern in no way "call[s] into question the principle that the definition of the elements of a criminal offense is entrusted to the legislature." Post, at 270 (internal quotation marks omitted). The constitutional guarantees that give rise to our concern in no way restrict the ability of legislatures to identify the conduct they wish to characterize as criminal or to define the facts whose proof is essential to the establishment of criminal liability. The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment; these are the safeguards going to the formality of notice, the identity of the factfinder, and the burden of proof.
[] For English practice, see, e. g., Langbein, Shaping the EighteenthCentury Criminal Trial, 50 U. Chi. L. Rev. 1, 22, 52-54 (1983); Green, The English Criminal Trial Jury, in The Trial Jury in England, France, Germany 1700-1900, pp. 41, 48-49 (A. Schioppa ed. 1987). For Colonial American practice, see, e. g., J. Goebell & T. Naughton, Law Enforcement in Colonial New York 673-674 (1944); State v. Bennet, 3 Brevard 515 (S. C. 1815).
[] The principle that the jury were the judges of fact and the judges the deciders of law was stated as an established principle as early as 1628 by Coke. See 1 E. Coke, Institutes of the Laws of England 155b (1628) ("ad questionem facti non respondent judices; ad questionem juris non respondent juratores"). See also Langbein, The English Criminal Trial Jury on the Eve of the French Revolution, in The Trial Jury in England, France, Germany, supra, at 34, n. 60. Even the traditional, juryrestrictive view of libel law recognized the jury's authority over matters of fact. See, e. g., King v. Francklin, 17 How. St. Tr. 626, 672 (K. B. 1731) ("These [publications and the words having the meaning ascribed to them] are the two matters of fact that come under your consideration; and of which you are proper judges. But then there is a third thing, to wit, Whether these defamatory expressions amount to a libel or not? This does not belong to the office of the jury, but to the office of the Court; because it is a matter of law, and not of fact; and of which the Court are the only proper judges"). Thus most participants in the struggle over jury autonomy in seditious libel cases viewed the debate as concerned with the extent of the jury's law-finding power, not its unquestioned role as the determiner of factual issues. See T. Green, Verdict According to Conscience 318-319 (1985). Some influential jurists suggested that it might also be seen as a struggle over the jury's right to find a particular fact, namely, the required criminal intent. See 10 W. Holdsworth, History of English Law 680-683 (1938).
[] See 4 Blackstone 354 ( jurors could choose to stop at special verdicts if they wished).
[] The dissent insists that Almendarez-Torres "controls the question before us," post, at 266, but in substantiating that assertion, it tellingly relies more heavily on the claims of the Almendarez-Torres dissenters than on the statements of the Almendarez-Torres majority. Neither source bears out the current dissent's conclusion. If, as the dissenters in this case suggest, Almendarez-Torres did not turn on the particular "sentencing factor at issue" there, 523 U. S., at 243, but instead stood for the broad proposition that any fact increasing the maximum permissible punishment may be determined by a judge by a preponderance, it is a mystery why the Almendarez-Torres majority engaged in so much discussion of recidivism, or why, at the crux of its constitutional discussion, it turned first to discuss the "tradition" of recidivism's treatment as a sentencing factor, ibid., or why it never announced the unqualified holding that today's dissenters claim to find in it. Admittedly, as the dissent here notes, the dissenters in Almendarez-Torres criticized the majority for what they considered the majority's unsupportable restraint in restricting their holding to recidivism. But that very criticism would have lacked its target if the Almendarez-Torres majority had not so doggedly refrained from endorsing the general principle the dissent in this case now attributes to them. The majority and the dissenters in Almendarez-Torres disagreed over the legitimacy of the Court's decision to restrict its holding to recidivism, but both sides agreed that the Court had done just that.
[] In tones of alarm, the dissent suggests, see post, at 254, 271, that our decision will unsettle the efforts of many States to bring greater consistency to their sentencing practices through provisions for determinate sentences and statutorily or administratively established guidelines governing sentencing decisions. The dissent's concern is misplaced for several reasons. Most immediately, our decision today does not announce any new principle of constitutional law, but merely interprets a particular federal statute in light of a set of constitutional concerns that have emerged through a series of our decisions over the past quarter century. But even if we assume that the question we raise will someday be followed by the answer the dissenters seem to fear, that answer would in no way hinder the States (or the National Government) from choosing to pursue policies aimed at rationalizing sentencing practices. If the constitutional concern we have expressed should lead to a rule requiring jury determination of facts that raise a sentencing ceiling, that rule would in no way constrain legislative authority to identify the facts relevant to punishment or to establish fixed penalties. The constitutional guarantees that prompt our interpretation bear solely on the procedures by which the facts that raise the possible penalty are to be found, that is, what notice must be given, who must find the facts, and what burden must be satisfied to demonstrate them. Finally, while we disagree with the dissent's dire prediction about the effect of our decision on the States' ability to choose certain sentencing policies, it should go without saying that, if such policies conflict with safeguards enshrined in the Constitution for the protection of the accused, those policies have to yield to the constitutional guarantees. See, e. g., Burch v. Louisiana, 441 U. S. 130, 139 (1979) (Nonunanimous verdicts by six-person criminal juries "sufficiently threate[n] the constitutional principles [animating the jury trial guarantee] that any countervailing interest of the State should yield"); cf. Almeida-Sanchez v. United States, 413 U. S. 266, 273 (1973) ("The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards").
[*] Together with No. 98-7952, Lowe v. Oklahoma Department of Corrections, No. 98-8073, Lowe v. Federal Bureau of Investigation, and No. 98-8082, Lowe v. Woodall et al., also on motion for leave to proceed in forma pauperis.